# UNITED BUILDING & CONSTRUCTION TRADES COUNCIL OF CAMDEN COUNTY AND VICINITY *v.* MAYOR AND COUNCIL OF THE CITY OF CAMDEN ET AL.

No. 81–2110.   Argued November 28, 1983—Decided February 21, 1984

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, White, Marshall, Powell, Stevens, and O'Connor, JJ., joined. Blackmun, J., filed a dissenting opinion, *post*, p. 223.

*Steven K. Kudatzky* argued the cause and filed briefs for appellant.

*N. Thomas Foster* argued the cause for appellees. With him on the brief for appellees Mayor and Council of the City of Camden was *Lawrence R. Velvel*. *Irwin I. Kimmelman*, Attorney General of New Jersey, *James J. Ciancia*, Assistant Attorney General, and *Joseph L. Yannotti*, Deputy

Attorney General, filed a brief for appellee Department of Treasury of the State of New Jersey.*

JUSTICE REHNQUIST delivered the opinion of the Court.

A municipal ordinance of the city of Camden, New Jersey, requires that at least 40% of the employees of contractors and subcontractors working on city construction projects be Camden residents. Appellant, the United Building and Construction Trades Council of Camden County and Vicinity (Council), challenges that ordinance as a violation of the Privileges and Immunities Clause, Art. IV, § 2, cl. 1, of the United States Constitution.[1] The Supreme Court of New Jersey rejected appellant's privileges and immunities attack on the ground that the ordinance discriminates on the basis of *municipal*, not state, residency. The court "decline[d] to apply the Privileges and Immunities Clause in the context of a municipal ordinance that has identical effects upon out-of-state citizens and New Jersey citizens not residing in the locality." 88 N. J. 317, 342, 443 A. 2d 148, 160 (1982). We conclude that the challenged ordinance is properly subject to the strictures of the Clause. We therefore reverse the judgment of the Supreme Court of New Jersey and remand the case for a determination of the validity of the ordinance under the appropriate constitutional standard.

On August 28, 1980, the Camden City Council, acting pursuant to a statewide affirmative-action program,[2] adopted an

---

*Wayne S. Henderson* filed a brief for the New England Legal Foundation as *amicus curiae* urging reversal.

*Joseph H. Rodriguez* and *Michael L. Perlin* filed a brief for the New Jersey Department of the Public Advocate as *amicus curiae* urging affirmance.

[1] "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

[2] The New Jersey Law Against Discrimination establishes a comprehensive affirmative-action program in the awarding of public works contracts. N. J. Stat. Ann. §§ 10:5-31 to 10:5-38 (West 1976). Any contractor, subcontractor, or firm seeking such contracts must guarantee compliance with an affirmative-action program approved by the State Treasurer. The

ordinance setting minority hiring "goals" on all public works contracts. Ordinance MC 1650, App. to Juris. Statement A36. The ordinance also created a hiring preference for Camden residents, with a separate 1-year residency requirement triggering eligibility for that preference. Ordinance MC 1650 § I(5), App. to Juris. Statement A38. As subsequently amended, the ordinance requires that on all construction projects funded by the city:[3]

> "The developer/contractor, in hiring for jobs, shall make every effort to employ persons residing within the City of Camden but, in no event, shall less than forty percent (40%) of the entire labor force be residents of the City of Camden." Ordinance MC 1653 § C(IV)(b), App. to Juris. Statement A56.

---

Treasurer is empowered to promulgate specific affirmative-action requirements based on "the percentage of population of minority groups in the State or areas thereof." § 10:5–36(a). Alternatively, the law permits municipal and state agencies to adopt and administer their own affirmative-action plans. § 10:5–36(c). Such plans must be submitted to the State Treasurer to ensure that each plan conforms to the statutory and administrative requirements, and "establishes an employment goal which is not lower than the applicable goal established by" the Treasurer. N. J. Admin. Code 17:27–6.5 (1982).

[3] The specific scope of the ordinance was stated as follows:

"Wherever the City of Camden spends funds derived from any public source for construction contracts or where the City of Camden confers a direct financial benefit upon a party, but excluding the grant of a property tax abatement, the fair market value of which exceeds $50,000.00, the provisions of this ordinance shall apply . . . . The provisions of this ordinance shall also apply to the development and construction of all residential housing of four (4) units or less." Ordinance MC 1650 § II, App. to Juris. Statement A38–A39.

Appellant argued initially that the final sentence of this section extended the reach of the city's ordinance to purely private construction in which municipal funds were not involved. Appellees claimed that the ordinance was never so interpreted and has only been applied to projects funded in whole or in part by city funds or funds administered by the city. In light of subsequent amendments, see *infra*, at 213–214, the scope of the ordinance is no longer in issue.

The contractor is also obliged to ensure that any subcontractors working on such projects adhere to the same requirement. Ordinance MC 1650 § VIII, App. to Juris. Statement A46.

The amended ordinance was submitted for approval to the Chief Affirmative Action Officer of the New Jersey Treasury Department in November 1980. Following brief administrative proceedings, the ordinance was designated as a state-approved affirmative-action construction program. Appellant, an association of labor organizations representing private employees in the building and construction trades in various New Jersey counties,[4] filed a notice of appeal with the Appellate Division of the New Jersey Superior Court challenging the final determination of the Treasury Department in approving the Camden plan. The New Jersey Supreme Court certified the appeal directly to that court to decide all the issues in the case.

Appellant challenged state approval of the resident-hiring quota as ultra vires, and as unconstitutional under the Commerce Clause and the Privileges and Immunities Clause of Art. IV of the United States Constitution and under the Fourteenth Amendment's Equal Protection Clause.[5] The New Jersey court sustained the Treasurer's action as consistent both with state law and the Federal Constitution. Citing *Reeves, Inc.* v. *Stake,* 447 U. S. 429 (1980), and *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S. 794 (1976), the court held that the resident quota was not subject to challenge under the Commerce Clause because the State was acting as a market participant rather than as a market regulator. 88

---

[4] The Council has at least some members who reside outside New Jersey.

[5] The Council also challenged approval of the minority hiring goals as ultra vires the State Treasurer's authority and as a violation of equal protection. The New Jersey court rejected both arguments, finding approval of the goal within the clear scope of the State Treasurer's delegated authority and the goal itself constitutional under *Fullilove* v. *Klutznick,* 448 U. S. 448 (1980). 88 N. J., 317, 326–328, 330–337, 443 A. 2d 148, 152–153, 154–158 (1982). The Council has not appealed from that ruling.

N. J., at 338–341, 443 A. 2d, at 158–160. The court also held that the quota did not violate the Privileges and Immunities Clause because it was not aimed primarily at out-of-state residents. "It almost certainly affects more New Jersey residents not living in Camden than it does out-of-state residents. Because the Camden ordinance does not affect 'the States['] . . . treatment of each other's residents,' . . . it does not violate any privilege of state citizenship." *Id.*, at 341–342, 443 A. 2d, at 160. Finally, the New Jersey Supreme Court held that the 1-year residency requirement did not violate the right to travel protected by the Equal Protection Clause, concluding that only a rational basis is required to uphold a residency requirement for city employment. *Id.*, at 342–343, 443 A. 2d, at 160–161.

Appellant then filed this appeal raising the same three constitutional challenges to the resident-hiring quota. We noted probable jurisdiction. 460 U. S. 1021 (1983). Since the Council filed its appeal, however, there have been two significant changes in the posture of the case. First, the Court decided *White* v. *Massachusetts Council of Construction Employers, Inc.*, 460 U. S. 204 (1983), which held that an executive order of the Mayor of Boston, requiring that at least 50% of all jobs on construction projects funded in whole or in part by city funds be filled by bona fide city residents, was immune from scrutiny under the Commerce Clause because Boston was acting as a market participant rather than as a market regulator. In light of the decision in *White*, appellant has abandoned its Commerce Clause challenge to the Camden ordinance.

Second, in July 1983 Camden amended its affirmative-action plan. The 1-year residency requirement was deleted, thereby mooting appellant's equal protection challenge based on that durational requirement. Now, a resident of the city of Camden is defined simply as "any person who resides in the City of Camden." App. to Brief for Appellees Mayor and Council of the City of Camden A–5. Also, the scope of

the ordinance was clarified.[6]   It now applies to any construction project "which is funded in whole or in part with City funds or funds which the City expends or administers in accordance with the terms of a grant." *Id.*, at A–4.   Finally, the 40% resident-hiring requirement was changed from a strict "quota" to a "goal" with which developers and contractors must make "every good faith effort" to comply.   *Id.*, at A–13.

Because of these changes, the only question left for our consideration is whether the Camden ordinance, as now written, violates the Privileges and Immunities Clause.[7]   We first address the argument, accepted by the Supreme Court of New Jersey, that the Clause does not even apply to a *municipal* ordinance such as this.   Two separate contentions are advanced in support of this position: first, that the Clause only applies to laws passed by a *State* and, second, that the Clause only applies to laws that discriminate on the basis of *state* citizenship.

The first argument can be quickly rejected.   The fact that the ordinance in question is a municipal, rather than a state, law does not somehow place it outside the scope of the Privileges and Immunities Clause.   First of all, one cannot easily distinguish municipal from state action in this case: the municipal ordinance would not have gone into effect without express approval by the State Treasurer.   As the New Jersey Supreme Court noted in discussing the constitutionality of the minority hiring goals:

> "By approving the Camden plan, the State Treasurer has established a minority hiring goal for the City of Camden that operates no differently than every other minority hiring goal established by the State Treas-

---

[6] See n. 3, *supra.*

[7] In *White* v. *Massachusetts Council of Construction Employers, Inc.,* 460 U. S. 204, 214–215, n. 12 (1983), we specifically declined to pass on the merits of a privileges and immunities challenge to the Mayor's executive order because the court below did not reach the issue.

urer. . . . The Council's constitutional challenge to the Camden minority hiring goal must therefore be interpreted as a challenge to the State Treasurer's general power to issue affirmative action hiring goals." 88 N. J., at 330, 443 A. 2d, at 154.

The constitutional challenge to the resident hiring preference, therefore, must also "be interpreted as a challenge to the State Treasurer's general power" to adopt such a preference.[8] The New Jersey court specifically found that the State Treasurer's approval of the resident-hiring preference was "not *ultra vires* or an abuse of discretion." *Id.*, at 329, 443 A. 2d, at 154.

More fundamentally, a municipality is merely a political subdivision of the State from which its authority derives. *Trenton* v. *New Jersey*, 262 U. S. 182, 187 (1923). It is as true of the Privileges and Immunities Clause as of the Equal Protection Clause that what would be unconstitutional if done directly by the State can no more readily be accomplished by a city deriving its authority from the State. *Memorial Hospital* v. *Maricopa County*, 415 U. S. 250, 256 (1974); *Avery* v. *Midland County*, 390 U. S. 474, 480–481 (1968). Thus, even if the ordinance had been adopted solely by Camden, and not pursuant to a state program or with state approval, the hiring preference would still have to comport with the Privileges and Immunities Clause.

The second argument merits more consideration. The New Jersey Supreme Court concluded that the Privileges and Immunities Clause does not apply to an ordinance that discriminates solely on the basis of *municipal* residency. The Clause is phrased in terms of *state* citizenship and was designed "to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages

---

[8] As noted by the Supreme Court of New Jersey, this case was brought as a challenge to the State's administrative approval of the Camden ordinance, and not as a direct challenge to Camden's adoption of it. 88 N. J., at 324, 443 A. 2d, at 151.

resulting from citizenship in those States are concerned."
*Paul* v. *Virginia*, 8 Wall. 168, 180 (1869). See also *Hicklin*
v. *Orbeck*, 437 U. S. 518, 523–524 (1978); *Ward* v. *Maryland*,
12 Wall. 418, 430 (1871).

> "The primary purpose of this clause, like the clauses
> between which it is located—those relating to full faith
> and credit and to interstate extradition of fugitives from
> justice—was to help fuse into one Nation a collection of
> independent, sovereign States. It was designed to in-
> sure to a citizen of State A who ventures into State B the
> same privileges which the citizens of State B enjoy.
> For protection of such equality the citizen of State A
> was not to be restricted to the uncertain remedies af-
> forded by diplomatic processes and official retaliation."
> *Toomer* v. *Witsell*, 334 U. S. 385, 395 (1948) (footnote
> omitted).

Municipal residency classifications, it is argued, simply do not
give rise to the same concerns.

We cannot accept this argument. We have never read the
Clause so literally as to apply it only to distinctions based on
state citizenship. For example, in *Mullaney* v. *Anderson*,
342 U. S. 415, 419–420 (1952), the Court held that the Alaska
Territory had no more freedom to discriminate against those
not residing in the Territory than did any State to favor its
own citizens. And despite some initial uncertainty, compare
*Travis* v. *Yale & Towne Mfg. Co.*, 252 U. S. 60, 78–79 (1920),
and *Blake* v. *McClung*, 172 U. S. 239, 246–247 (1898), with
*Douglas* v. *New York, N. H. & H. R. Co.*, 279 U. S. 377,
386–387 (1929), and *La Tourette* v. *McMaster*, 248 U. S. 465,
469–470 (1919), it is now established that the terms "citizen"
and "resident" are "essentially interchangeable," *Austin* v.
*New Hampshire*, 420 U. S. 656, 662, n. 8 (1975), for purposes
of analysis of most cases under the Privileges and Immunities
Clause. See *Hicklin* v. *Orbeck, supra,* at 524, n. 8; *Toomer*
v. *Witsell, supra,* at 397. A person who is not residing in a
given State is *ipso facto* not residing in a city within that

State. Thus, whether the exercise of a privilege is conditioned on state residency or on municipal residency he will just as surely be excluded.

Given the Camden ordinance, an out-of-state citizen who ventures into New Jersey will not enjoy the same privileges as the New Jersey citizen residing in Camden. It is true that New Jersey citizens not residing in Camden will be affected by the ordinance as well as out-of-state citizens. And it is true that the disadvantaged New Jersey residents have no claim under the Privileges and Immunities Clause. *Slaughter-House Cases,* 16 Wall. 36, 77 (1873). But New Jersey residents at least have a chance to remedy at the polls any discrimination against them. Out-of-state citizens have no similar opportunity, *Austin* v. *New Hampshire, supra,* at 662, and they must not "be restricted to the uncertain remedies afforded by diplomatic processes and official retaliation." *Toomer* v. *Witsell, supra,* at 395.[9] We conclude that Cam-

---

[9] The dissent suggests that New Jersey citizens not residing in Camden will adequately protect the interests of out-of-state residents and that the scope of the Privileges and Immunities Clause should be measured in light of this political reality. See, *post,* at 231–232; *post,* at 227 ("the Framers had every reason to believe that intrastate discrimination based on municipal residence could and would be dealt with by the States themselves in those instances where it persisted"). What the dissent fails to appreciate is that the Camden ordinance at issue in this case was adopted pursuant to a comprehensive, statewide program applicable in all New Jersey cities. See n. 2, *supra.* The Camden resident-preference ordinance has already received state sanction and approval, see *supra,* at 212, and every New Jersey city is free to adopt a similar protectionist measure. Some have already done so. See Reply Brief for Appellant 41–42, n. 30, and App. A. Thus, it is hard to see how New Jersey residents living outside Camden will protect the interests of out-of-state citizens.

More fundamentally, the dissent's proposed blanket exemption for all classifications that are less than statewide would provide States with a simple means for evading the strictures of the Privileges and Immunities Clause. Suppose, for example, that California wanted to guarantee that all employees of contractors and subcontractors working on construction projects funded in whole or in part by state funds are state residents. Under the dissent's analysis, the California Legislature need merely divide

den's ordinance is not immune from constitutional review at the behest of out-of-state residents merely because some in-state residents are similarly disadvantaged. Cf. *Zobel* v. *Williams*, 457 U. S. 55, 75 (1982) (O'CONNOR, J., concurring in judgment).

Application of the Privileges and Immunities Clause to a particular instance of discrimination against out-of-state residents entails a two-step inquiry. As an initial matter, the Court must decide whether the ordinance burdens one of those privileges and immunities protected by the Clause. *Baldwin* v. *Montana Fish and Game Comm'n*, 436 U. S. 371, 383 (1978). Not all forms of discrimination against citizens of other States are constitutionally suspect.

> "Some distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of individual States, and are permitted; other distinctions are prohibited because they hinder the formation, the purpose, or the development of a single Union of those States. Only with respect to those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally." *Ibid.*

As a threshold matter, then, we must determine whether an out-of-state resident's interest in employment on public works contracts in another State is sufficiently "fundamental" to the promotion of interstate harmony so as to "fall within the purview of the Privileges and Immunities Clause." *Id.*, at 388. See also *Canadian Northern R. Co.* v. *Eggen*,

---

the State in half, providing one resident-hiring preference for northern Californians on all such projects taking place in northern California, and one for southern Californians on all projects taking place in southern California. State residents generally would benefit from the law at the expense of out-of-state residents; yet, the law would be immune from scrutiny under the Clause simply because it was not phrased in terms of *state* citizenship or residency. Such a formalistic construction would effectively write the Clause out of the Constitution.

252 U. S. 553, 560 (1920); *Blake* v. *McClung,* 172 U. S., at 248.

Certainly, the pursuit of a common calling is one of the most fundamental of those privileges protected by the Clause. *Baldwin* v. *Montana Fish and Game Comm'n, supra,* at 387. Many, if not most, of our cases expounding the Privileges and Immunities Clause have dealt with this basic and essential activity. See, *e. g., Hicklin* v. *Orbeck,* 437 U. S. 518 (1978); *Austin* v. *New Hampshire,* 420 U. S. 656 (1975); *Mullaney* v. *Anderson,* 342 U. S. 415 (1952); *Toomer* v. *Witsell,* 334 U. S. 385 (1948); *Ward* v. *Maryland,* 12 Wall. 418 (1871). Public employment, however, is qualitatively different from employment in the private sector; it is a subspecies of the broader opportunity to pursue a common calling. We have held that there is no fundamental right to government employment for purposes of the Equal Protection Clause. *Massachusetts Bd. of Retirement* v. *Murgia,* 427 U. S. 307, 313 (1976) *(per curiam).* Cf. *McCarthy* v. *Philadelphia Civil Service Comm'n,* 424 U. S. 645 (1976) *(per curiam)* (rejecting equal protection challenge to municipal residency requirement for municipal workers). And in *White,* 460 U. S., at 211, n. 7, we held that for purposes of the Commerce Clause everyone employed on a city public works project is, "in a substantial if informal sense, 'working for the city.'"

It can certainly be argued that for purposes of the Privileges and Immunities Clause everyone affected by the Camden ordinance is also "working for the city" and, therefore, has no grounds for complaint when the city favors its own residents. But we decline to transfer mechanically into this context an analysis fashioned to fit the Commerce Clause. Our decision in *White* turned on a distinction between the city acting as a market participant and the city acting as a market regulator. The question whether employees of contractors and subcontractors on public works projects were or were not, in some sense, working for the city was crucial to that analysis. The question had to be answered in order to chart the boundaries of the distinction. But the distinction be-

tween market participant and market regulator relied upon in *White* to dispose of the Commerce Clause challenge is not dispositive in this context. The two Clauses have different aims and set different standards for state conduct.

The Commerce Clause acts as an implied restraint upon state regulatory powers. Such powers must give way before the superior authority of Congress to legislate on (or leave unregulated) matters involving interstate commerce. When the State acts solely as a market participant, no conflict between state *regulation* and federal regulatory authority can arise. *White, supra,* at 206–208; *Reeves, Inc.* v. *Stake,* 447 U. S., at 436–437; *Hughes* v. *Alexandria Scrap Corp.,* 426 U. S., at 810. The Privileges and Immunities Clause, on the other hand, imposes a direct restraint on state action in the interests of interstate harmony. *Hicklin* v. *Orbeck, supra,* at 523–524; *Ward* v. *Maryland, supra,* at 430; *Paul* v. *Virginia,* 8 Wall., at 180. This concern with comity cuts across the market regulator-market participant distinction that is crucial under the Commerce Clause. It is discrimination against out-of-state residents on matters of fundamental concern which triggers the Clause, not regulation affecting interstate commerce. Thus, the fact that Camden is merely setting conditions on its expenditures for goods and services in the marketplace does not preclude the possibility that those conditions violate the Privileges and Immunities Clause.

In *Hicklin* v. *Orbeck, supra,* we struck down as a violation of the Privileges and Immunities Clause an "Alaska Hire" statute containing a resident-hiring preference for all employment related to the development of the State's oil and gas resources.[10] Alaska argued in that case that "because the oil and gas that are the subject of Alaska Hire are *owned*

---

[10] Under the dissent's formalistic approach, see n. 9, *supra,* the "Alaska Hire" statute in *Hicklin* would have been exempt from any challenge under the Privileges and Immunities Clause if the Alaska Legislature had simply excluded from the hiring preference the residents of one remote county. Yet the discriminatory effect on out-of-state residents, with which, after all, the Clause is concerned, would have been the same.

by the State, this ownership, of itself, is sufficient justification for the Act's discrimination against nonresidents, and takes the Act totally without the scope of the Privileges and Immunities Clause." *Id.*, at 528 (footnote omitted). We concluded, however, that the State's interest in controlling those things it claims to own is not absolute. "Rather than placing a statute completely beyond the Clause, a State's ownership of the property with which the statute is concerned is a factor—although often the crucial factor—to be considered in evaluating whether the statute's discrimination against noncitizens violates the Clause." *Id.*, at 529. See also *Baldwin* v. *Montana Fish and Game Comm'n,* 436 U. S., at 385. Much the same analysis, we think, is appropriate to a city's efforts to bias private employment decisions in favor of its residents on construction projects funded with public moneys. The fact that Camden is expending its own funds or funds it administers in accordance with the terms of a grant is certainly a factor—perhaps the crucial factor—to be considered in evaluating whether the statute's discrimination violates the Privileges and Immunities Clause. But it does not remove the Camden ordinance completely from the purview of the Clause.

In sum, Camden may, without fear of violating the Commerce Clause, pressure private employers engaged in public works projects funded in whole or in part by the city to hire city residents. But that same exercise of power to bias the employment decisions of private contractors and subcontractors against out-of-state residents may be called to account under the Privileges and Immunities Clause. A determination of whether a privilege is "fundamental" for purposes of that Clause does not depend on whether the employees of private contractors and subcontractors engaged in public works projects can or cannot be said to be "working for the city." The opportunity to seek employment with such private employers is "sufficiently basic to the livelihood of the Nation," *Baldwin* v. *Montana Fish and Game Comm'n, supra,* at 388, as to fall within the purview of the Privileges

and Immunities Clause even though the contractors and sub-contractors are themselves engaged in projects funded in whole or part by the city.

The conclusion that Camden's ordinance discriminates against a protected privilege does not, of course, end the inquiry. We have stressed in prior cases that "[l]ike many other constitutional provisions, the privileges and immunities clause is not an absolute." *Toomer* v. *Witsell*, 334 U. S., at 396. It does not preclude discrimination against citizens of other States where there is a "substantial reason" for the difference in treatment. "[T]he inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them." *Ibid.* As part of any justification offered for the discriminatory law, nonresidents must somehow be shown to "constitute a peculiar source of the evil at which the statute is aimed." *Id.*, at 398.

The city of Camden contends that its ordinance is necessary to counteract grave economic and social ills. Spiralling unemployment, a sharp decline in population, and a dramatic reduction in the number of businesses located in the city have eroded property values and depleted the city's tax base. The resident-hiring preference is designed, the city contends, to increase the number of employed persons living in Camden and to arrest the "middle-class flight" currently plaguing the city. The city also argues that all non-Camden residents employed on city public works projects, whether they reside in New Jersey or Pennsylvania, constitute a "source of the evil at which the statute is aimed." That is, they "live off" Camden without "living in" Camden. Camden contends that the scope of the discrimination practiced in the ordinance, with its municipal residency requirement, is carefully tailored to alleviate this evil without unreasonably harming nonresidents, who still have access to 60% of the available positions.

Every inquiry under the Privileges and Immunities Clause "must . . . be conducted with due regard for the principle that

the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures." *Toomer* v. *Witsell, supra,* at 396. This caution is particularly appropriate when a government body is merely setting conditions on the expenditure of funds it controls. See *supra,* at 221. The Alaska Hire statute at issue in *Hicklin* v. *Orbeck,* 437 U. S. 518 (1978), swept within its strictures not only contractors and subcontractors dealing directly with the State's oil and gas; it also covered suppliers who provided goods and services to those contractors and subcontractors. We invalidated the Act as "an attempt to force virtually all businesses that benefit in some way from the economic ripple effect of Alaska's decision to develop its oil and gas resources to bias their employment practices in favor of the State's residents." *Id.,* at 531. No similar "ripple effect" appears to infect the Camden ordinance. It is limited in scope to employees working directly on city public works projects.

Nonetheless, we find it impossible to evaluate Camden's justification on the record as it now stands. No trial has ever been held in the case. No findings of fact have been made. The Supreme Court of New Jersey certified the case for direct appeal after the brief administrative proceedings that led to approval of the ordinance by the State Treasurer. It would not be appropriate for this Court either to make factual determinations as an initial matter or to take judicial notice of Camden's decay. We, therefore, deem it wise to remand the case to the New Jersey Supreme Court. That court may decide, consistent with state procedures, on the best method for making the necessary findings.

The judgment of the Supreme Court of New Jersey is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

Justice Blackmun, dissenting.

For over a century the underlying meaning of the Privileges and Immunities Clause of the Constitution's Article

IV[1] has been regarded as settled: at least absent some substantial, noninvidious justification, a State may not discriminate between its own residents and residents of other States on the basis of state citizenship.[2]   See generally *Hicklin* v. *Orbeck*, 437 U. S. 518, 523–526 (1978); *Toomer* v. *Witsell*, 334 U. S. 385, 395 (1948); *Hague* v. *CIO*, 307 U. S. 496, 511 (1939) (opinion of Roberts, J.); *Slaughter-House Cases*, 16 Wall. 36, 77 (1873); *Paul* v. *Virginia*, 8 Wall. 168, 180 (1869).

Today, however, the Court casually extends the scope of the Clause by holding that it applies to laws that discriminate *among* state residents on the basis of *municipal* residence, simply because discrimination on the basis of municipal residence disadvantages citizens of other States *"ipso facto."* *Ante*, at 216–217.   This novel interpretation arrives accompanied by little practical justification and no historical or textual support whatsoever.   Because I believe that the Privileges and Immunities Clause was not intended to apply to the kind of municipal discrimination presented by this case, I would affirm the judgment of the Supreme Court of New Jersey.[3]

## I

The historical underpinnings of the Privileges and Immunities Clause are not in serious dispute.   The Clause was derived from the fourth Article of Confederation[4] and was

---

[1] "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."   U. S. Const., Art. IV, § 2, cl. 1.

[2] As the Court points out, it has come to treat the terms "citizen" and "resident" interchangeably for purposes of Privileges and Immunities Clause analysis.   *Ante*, at 216.   For the sake of simplicity I shall do the same, except where the context requires a distinction to be drawn.

[3] I agree with the Court that the Camden ordinance is not insulated from scrutiny under the Privileges and Immunities Clause merely because it is a municipal ordinance rather than a state statute.   *Ante*, at 214–215.   See *Woodruff* v. *Parham*, 8 Wall. 123, 140 (1869) (dictum).   I also agree that appellant's equal protection challenge to the ordinance's durational requirement has been mooted by the deletion of that provision in 1983.   *Ante*, at 213.   See *Hall* v. *Beals*, 396 U. S. 45, 48 (1969).

[4] "The better to secure and perpetuate mutual friendship and intercourse among the people of the different States in this Union, the free in-

designed to carry forward that provision's prescription of interstate comity. *Austin* v. *New Hampshire*, 420 U. S. 656, 660–661 (1975); *United States* v. *Wheeler*, 254 U. S. 281, 294 (1920); *Slaughter-House Cases*, 16 Wall., at 75. Both the text of the Clause and the historical record confirm that the Framers meant to foreclose any one State from denying citizens of other States the same "privileges and immunities" accorded its own citizens. See *Austin* v. *New Hampshire*, 420 U. S., at 660–661. James Madison complained during the Constitutional Convention of "Acts of Virga. & Maryland which give a preference to their own citizens in cases where the Citizens [of other States] are entitled to equality of privileges by the Articles of Confederation." [5] Alexander Hamilton, who deemed the Privileges and Immunities Clause "the basis of the Union," The Federalist No. 80, p. 502 (B. Wright ed. 1961), expressly linked the Clause with the concern over state parochialism that gave rise to the federal courts' diversity jurisdiction under Article III:

> "[I]n order to [ensure] the inviolable maintenance of that equality of privileges and immunities to which the citizens of the Union will be entitled, the national judiciary ought to preside in all cases in which one State or its citizens are opposed to another State or its citizens. To secure the full effect of so fundamental a provision against all evasion and subterfuge, it is necessary that its construction should be committed to that tribunal which, having no local attachments, will be likely to be impartial

habitants of each of these States, paupers, vagabonds and fugitives from justice excepted, shall be entitled to all privileges and immunities of free citizens in the several States; and the people of each State shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce, subject to the same duties, impositions and restrictions as the inhabitants thereof respectively. . . ." Articles of Confederation, Art. 4, 1 Stat. 4.

[5] 1 M. Farrand, Records of the Federal Convention of 1787, p. 317 (1911) (footnote omitted).

between the different States and their citizens . . . ."
*Ibid.*

While the Framers thus conceived of the Privileges and Immunities Clause as an instrument for frustrating discrimination based on state citizenship, there is no evidence of any sort that they were concerned by intrastate discrimination based on municipal residence. The most obvious reason for this is also the most simple one: by the time the Constitution was enacted, such discrimination was rarely practiced and even more rarely successful.[6] Even had attempts to practice the kind of economic localism at issue here been more widespread, moreover, there is little reason to believe that the Framers would have devoted their limited institutional resources to bringing such conduct within the ambit of the Privileges and Immunities Clause. Whatever the weaknesses of the new state governments in suppressing sectional conflicts that gave rise to outright physical violence, like Shays' Rebellion in 1786–1787, the States had more than adequate powers to prevent localities from disrupting the States' internal economic affairs through discriminatory ordinances and regulations. By the time the Constitution was adopted, most state legislatures had assumed the power to grant and alter municipal charters and the power to legislate with respect to municipal affairs.[7] Even before the Revolution, the colonial legislatures had shown themselves willing and able to exercise this authority to override local protectionist ordinances. In 1746, for example, the New York Assembly dismantled a cartel of New York City lawyers by requiring the city to open its Mayor's Court to qualified lawyers from

---

[6] See, *e. g.*, E. Griffith, History of American City Government: The Colonial Period 132–143 (1972 ed.). The common trend in colonial cities in the two generations before the Revolution was for pre-existing restrictions on trade and craft work by "outsiders" to lapse into desuetude under the pressures of increasing population mobility. See *id.*, at 135, 141–143.

[7] See McBain, The Legal Status of the American Colonial City, 40 Pol. Sci. Q. 177, 192–200 (1925).

throughout the colony.[8]  As a result, the Framers had every reason to believe that intrastate discrimination based on municipal residence could and would be dealt with by the States themselves in those instances where it persisted.[9]

In light of the historical context in which the Privileges and Immunities Clause was adopted, it hardly is surprising that none of this Court's intervening decisions has suggested that the Clause applies to discrimination on the basis of municipal residence.  To the contrary, while the Court never has addressed the question directly,[10] it repeatedly has proceeded on the assumption that the "Privileges and Immunities of Citizens" to which the Clause refers are entitlements held equally by all citizens of a State.  Thus, in *Paul* v. *Virginia*,

---

[8] Griffith, *supra*, at 143, 341.

[9] The idea that the Framers intended the Privileges and Immunities Clause to reach discrimination based on municipal residence appears even more implausible if one assumes that the Framers literally meant to confine the Clause's protections to "Privileges and Immunities of *Citizens*." If the purpose of the Clause were simply to relieve citizens of other States "from the disabilities of alienage" and guarantee them "the advantages resulting from citizenship," *Paul* v. *Virginia*, 8 Wall. 168, 180 (1869), the Clause necessarily would not be implicated by an ordinance like Camden's; the benefits created by such an ordinance are not an incident of state citizenship, even for residents of the municipality itself.

[10] The Court had a remarkably similar New Orleans ordinance before it in *Chadwick* v. *Kelley*, 187 U. S. 540 (1903), but declined to reach the Privileges and Immunities Clause question because the party challenging the ordinance was himself a resident of New Orleans. *Id.*, at 546. See also *Gallup* v. *Schmidt*, 183 U. S. 300 (1902); *Downham* v. *Alexandria Council*, 10 Wall. 173 (1870). Few decisions by state and federal courts have considered the question. See, *e. g.*, *Ward Baking Co.* v. *Fernandina*, 29 F. 2d 789 (SD Fla. 1928); *Mount Pleasant* v. *Clutch*, 6 Iowa 546 (1858); *In re Jarvis*, 66 Kan. 329, 71 P. 576 (1903); *Fecheimer Bros. & Co.* v. *Louisville*, 84 Ky. 306, 2 S. W. 65 (1886); *State ex rel. Greenwood* v. *Nolan*, 108 Minn. 170, 122 N. W. 255 (1909); *Rothermel* v. *Meyerle*, 136 Pa. 250, 20 A. 583 (1890). Academic commentary on the question is limited. See R. Howell, The Privileges and Immunities of State Citizenship 45–47 (1918); Eule, Laying the Dormant Commerce Clause to Rest, 91 Yale L. J. 425, 449, n. 128 (1982); Meyers, The Privileges and Immunities of Citizens in the Several States, pt. 2, 1 Mich. L. Rev. 364, 383 (1903).

*supra*, the Court stated that the Clause safeguards the enjoyment of "those privileges and immunities which are common to the citizens [in a State] under their constitution and laws by virtue of their being citizens." 8 Wall., at 180. In *Blake* v. *McClung*, 172 U. S. 239 (1898), the Court condemned a Tennessee statute that granted a priority to resident creditors over nonresident creditors on the assumption that the State's rules governing debtor-creditor relations "will be applied by its courts in all appropriate cases between citizens of that State, without making any distinction *between them*." *Id.*, at 254 (emphasis in original). In *Travellers' Insurance Co.* v. *Connecticut*, 185 U. S. 364 (1902), the Court rejected a Privileges and Immunities Clause challenge to a Connecticut statute that taxed nonresident stockholders at a nominally higher rate than resident stockholders, on the ground that the direct differential was roughly offset by municipal taxes paid only by residents. The Court recognized that the burden borne by nonresidents might exceed that borne by residents in a particular year, but pointed out that "a like inequality will exist between residents of different localities in the State by reason of the different rates of taxation in those localities"; the disparate burden was permissible under these circumstances because "[y]ou cannot put *one* resident against *one* non-resident stockholder and by a comparison of their different burdens determine the validity of the legislation any more than you can place a stockholder resident in one municipality over against a stockholder resident in another municipality, and by comparison of their different burdens determine the validity of the tax law in respect to resident stockholders." *Id.*, at 369 (emphasis added). In each case, the underlying assumption has been that the constitutionality *vel non* of a particular statute under the Privileges and Immunities Clause turns on whether the statute deprives nonresidents of benefits enjoyed in common by state residents by virtue of their residence *simpliciter*.

Indeed, I had understood the Court to have reaffirmed this principle only two Terms ago in *Zobel* v. *Williams*, 457 U. S.

55 (1982). In *Zobel,* the Court held that an Alaska statute which allocated state treasury refunds to state residents on the basis of the length of their residence violated the Equal Protection Clause. The Court declined, however, to hold that the statute violated the Privileges and Immunities Clause. It observed that the statute "does not simply make distinctions between native-born Alaskans and those who migrate to Alaska from other states;" instead, it "also discriminates among long-time residents and even native-born residents." 457 U. S., at 59, n. 5. As a result:

> "The statute does not involve the kind of discrimination which the Privileges and Immunities Clause of Art. IV was designed to prevent. That Clause 'was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy.' *Toomer* v. *Witsell,* 334 U. S. 385, 395 (1948). The Clause is thus not applicable to this case." *Id.,* at 60, n. 5.

I am somewhat at a loss to understand how the Court's decision today can be reconciled with its reasoning in *Zobel.*[11] The Alaska statute at issue in *Zobel* fell outside the scope of

---

[11] JUSTICE O'CONNOR, who concurred in the judgment in *Zobel,* wrote separately to express the contrary view that the Privileges and Immunities Clause applied to the Alaska statute even though the statute arguably "discriminates among classes of residents, rather than between residents and nonresidents." 457 U. S., at 75. The Court's apparent reliance on JUSTICE O'CONNOR's concurrence, see *ante,* at 217–218, and its failure to note the position of the Court in *Zobel* are one measure of the inconsistency between today's decision and *Zobel.* Even JUSTICE O'CONNOR's reasoning, however, does not support the result the Court reaches today. For JUSTICE O'CONNOR, the critical effect of the Alaska statute was that "[e]ach group of citizens who migrated to Alaska in the past, or chooses to move there in the future, lives in the State on less favorable terms than those who arrived earlier"; a nonresident who moved to Alaska "labors under a continuous disability" because of his prior residence in another State. 457 U. S., at 75. Here, in contrast, the Camden ordinance imposes no "continuous disability" on anyone who takes up residence in the city.

the Privileges and Immunities Clause for the elementary reason that it did not discriminate between state residents and nonresidents on the basis of state residence; rather, it discriminated *among* state residents in a way that disadvantaged nonresidents as well but did not thereby implicate the underlying concerns of the Privileges and Immunities Clause. The Camden ordinance presently before the Court occupies precisely the same position.

The Court's decision clashes with other Privileges and Immunities Clause precedents as well. The Court recognizes, as it must, that the Privileges and Immunities Clause does not afford state residents any protection against their own State's laws. See, *e. g., Bradwell* v. *Illinois*, 16 Wall. 130, 138 (1873); *Slaughter-House Cases*, 16 Wall., at 77. When this settled rule is combined with the Court's newly fashioned rule concerning municipal discrimination, however, it has the perverse effect of vesting non-New Jersey residents with constitutional privileges that are not enjoyed by most New Jersey residents themselves. This result is directly contrary to the Court's longstanding position that the Privileges and Immunities Clause does not give nonresidents "higher and greater privileges than are enjoyed by the citizens of the state itself." *Bank of Augusta* v. *Earle*, 13 Pet. 519, 586 (1839); accord, *Shaffer* v. *Carter*, 252 U. S. 37, 53 (1920); *Detroit* v. *Osborne*, 135 U. S. 492, 498 (1890). When judicial alchemy transmutes gold into lead in this fashion, it is time for the Court to reexamine its reasoning.

Finally, the Court fails to attend to the functional considerations that underlie the Privileges and Immunities Clause. The Clause has been a necessary limitation on state autonomy not simply because of the self-interest of individual States, but because state parochialism is likely to go unchecked by state political processes when those who are disadvantaged are by definition disenfranchised as well. The Clause remedies this breakdown in the representative process by requiring state residents to bear the same burdens that they choose to place on nonresidents; "by constitution-

ally tying the fate of outsiders to the fate of those possessing political power, the framers insured that their interests would be well looked after." J. Ely, Democracy and Distrust 83 (1980). As a practical matter, therefore, the scope of the Clause may be measured by asking whether failure to link the interests of those who are disadvantaged with the interests of those who are preferred will consign the former group to "the uncertain remedies afforded by diplomatic processes and official retaliation." *Toomer* v. *Witsell*, 334 U. S., at 395; see *Austin* v. *New Hampshire*, 420 U. S., at 662.

Contrary to the Court's tacit assumption, discrimination on the basis of municipal residence is substantially different in this regard from discrimination on the basis of state citizenship. The distinction is simple but fundamental: discrimination on the basis of municipal residence penalizes persons within the State's political community as well as those without. The Court itself points out that while New Jersey citizens who reside outside Camden are not protected by the Privileges and Immunities Clause, they may resort to the State's political processes to protect themselves. *Ante*, at 217. What the Court fails to appreciate is that this avenue of relief for New Jersey residents works to protect residents of other States as well; disadvantaged state residents who turn to the state legislature to displace ordinances like Camden's further the interests of nonresidents as well as their own.[12]

---

[12] The Court suggests that reliance on the state political process is misplaced because the Camden ordinance itself "was adopted pursuant to a comprehensive statewide program applicable in all New Jersey cities" and has received "state sanction and approval." *Ante*, at 217, n. 9. The Court misrepresents the nature of both the statewide program and the "sanction and approval" given the Camden ordinance. The ordinance was enacted pursuant to a state statute designed solely to further equal opportunity and affirmative action in New Jersey public works contracting; the New Jersey Supreme Court itself accepted appellees' argument that the state statute "does not contemplate any residency requirement." 88 N. J. 317, 328, 443 A. 2d 148, 153 (1982). In turn, the ordinance was approved by a state agency whose sole mandate was to ensure that the ordinance was not in-

Nor is this mechanism for relief merely a theoretical one; in the past decade several States, including California and Georgia, have repealed or forbidden protectionist ordinances like the one at issue here.[13] In short, discrimination on the basis of municipal residence simply does not consign residents of other States, in the words of *Toomer, supra,* to "the uncertain remedies afforded by diplomatic processes and official retaliation." The Court thus has applied the Privileges and Immunities Clause without regard for the political ills that it was designed to cure.[14]

---

consistent with the minimum affirmative-action requirements of the state statute. *Id.,* at 329, 443 A. 2d, at 154. The municipal residency requirement thus has neither been embraced by the state legislature nor approved by any state agency with the authority to reject the ordinance on the basis of the residency requirement alone. Under these circumstances, the Court's observation reduces to the pedestrian point that the Camden ordinance has been adopted by the city and has yet to be displaced by the state legislature. That fact says nothing at all about the likelihood that the ordinance will be repealed in the future, of course, particularly should it develop on remand that interested parties like appellant ultimately must seek political rather than judicial vindication.

[13] See Eisinger, Municipal Residency Requirements and the Local Economy, 64 Soc. Sci. Q. 85, 87 (1983); Note, The Constitutionality of Residency Requirements for Municipal Employees, 24 Emory L. J. 446, 448, n. 7 (1975); Note, Municipal Employee Residency Requirements and Equal Protection, 84 Yale L. J. 1684, n. 3 (1975).

[14] Rather than respond directly to these considerations, the Court finds it easier to take issue with what it characterizes as "the dissent's proposed blanket exemption" from the Privileges and Immunities Clause "for all classifications that are less than statewide." *Ante,* at 217, n. 9. The Court's refusal to accept such an exemption is understandable; what is curious is why the Court attributes the exemption to this dissent. As I indicate below, I am no less prepared than the Court has been in the past to apply the Privileges and Immunities Clause when the classification at issue is practically equivalent to those explicitly identified by the Clause. If the Alaska Legislature were to try to rehabilitate the "Alaska Hire" statute invalidated in *Hicklin* v. *Orbeck,* 437 U. S. 518 (1978), by excluding "the residents of one remote county" from the hiring preference, *ante,* at 220, n. 10, for example, the classification would come within the ambit of the Clause because it would bear the same sort of practical relationship to a classification based on state citizenship as do classifications based on state

It still might be possible to redeem the Court's decision if it were compelled by the language of the Privileges and Immunities Clause. The Court itself, however, concedes that its interpretation of the Clause does not attach readily to a constitutional provision phrased solely in terms of state citizenship. *Ante,* at 216. The Court seeks to defend its excursion beyond the frontiers of the constitutional language on the ground that it never has read the Privileges and Immunities Clause literally to apply only to classifications based on state citizenship. *Ibid.* The examples it cites, however, are hardly compelling support. *Mullaney* v. *Anderson,* 342 U. S. 415 (1952), held not that the Privileges and Immunities Clause applies *ex proprio vigore* to discrimination by a territorial legislature based on territorial residence, but rather that Congress had made the Privileges and Immunities Clause applicable to the Territory of Alaska by statute. See 342 U. S., at 419–420.[15] See also *Haavik* v. *Alaska Packers*

residence. The Court fails to explain why a classification that benefits all state residents *other* than the residents of a single locality stands in the same position, in terms of the practical considerations underlying the Clause, as a classification that benefits *only* the residents of one locality.

The Court raises the alternative prospect that a State might evade the Privileges and Immunities Clause by dividing itself in half and granting the residents in each half of the State employment preferences over residents in the other half of the State. *Ante,* at 217–218, n. 9. The Clause exists to protect against those classifications that a State's political process cannot be relied on to prevent, however, not those that it can, and there is no reason to believe that state residents will be willing to forgo access to employment in one half of a State merely to obtain privileged access to jobs in the other half. The fact that no State has attempted anything resembling the Court's proposed maneuver in the two centuries since the adoption of the Clause, despite the fact that none of this Court's precedents has foreclosed the option, strongly suggests that state political processes can be trusted to prevent this kind of Balkanization. The Court cannot justify deforming the Constitution's response to real problems by invoking imaginary and unrealistic ones.

[15] "Section 3 [of the Organic Act of Alaska] provides 'The Constitution of the United States . . . shall have the same force and effect within the said Territory as elsewhere in the United States.' 37 Stat. 512, 48 U. S. C. § 23. And § 9 extends the legislative power of the Territory to 'all rightful

*Assn.*, 263 U. S. 510, 515 (1924). Even if *Mullaney* v. *Anderson* set forth the proposition for which it is cited, moreover, the practical similarity between discrimination based on territorial residence and discrimination based on state residence has no parallel here. Similarly, while the Court unquestionably has come to treat the terms "citizen" and "resident" in this area as "essentially interchangeable," *Austin* v. *New Hampshire*, 420 U. S., at 662, n. 8, it has done so not out of a general disregard for the Constitution's language, but rather because the practical relationship between residence and citizenship is close enough that discrimination on the basis of the one criterion effectively amounts to discrimination based on the other. Cf. *Travis* v. *Yale & Towne Mfg. Co.*, 252 U. S. 60, 79 (1920); Currie & Schreter, Unconstitutional Discrimination in the Conflict of Laws: Privileges and Immunities, 69 Yale L. J. 1323, 1344 (1960). These decisions are not, therefore, license for the Court to set aside the language of the Privileges and Immunities Clause as an inconvenient obstacle to a preferred result. Whenever this Court has departed from the literal language of the Clause in the past, it has remained faithful to the underlying purposes of the Clause. For the reasons already set forth, I believe that the Court's decision today does not satisfy that requirement.

## II

Needless to say, my view of the constitutional question in this case does not depend on my personal opinion about the desirability of the course on which Camden has embarked. I do not find "beggar thy neighbor" economic policies any more

---

subjects of legislation not inconsistent with the Constitution and laws of the United States, . . . .' 37 Stat. 512, 514, 48 U. S. C. § 77. In the light of these sections, we cannot presume that Congress authorized the Territorial Legislature to treat citizens of States the way States cannot treat citizens of sister States. . . . [T]he Territorial Legislature, particularly in the regulation of fisheries, was granted no greater power over citizens of other States than a State legislature has." 342 U. S., at 420.

attractive when practiced by municipalities than when practiced by States or nations. The unedifying sight of localities fighting for parochial gain at one another's expense gives new urgency to Benjamin Franklin's reputed warning that "we must . . . all hang together, or most assuredly we shall all hang separately." R. Clark, Benjamin Franklin 286 (1983). At the risk of restating the obvious, however, the issue before us is not the desirability of the ordinance but its constitutionality—more particularly, its constitutionality under the Privileges and Immunities Clause.[16] Because I believe that the Clause does not apply to discrimination based on municipal residence, I dissent.

---

[16] I argued without success last Term that, absent congressional authorization, ordinances like Camden's violate the dormant Commerce Clause. *White* v. *Massachusetts Council of Construction Employers, Inc.*, 460 U. S. 204, 215 (1983) (opinion concurring in part and dissenting in part). Although the Privileges and Immunities Clause and the Commerce Clause embody closely related principles of interstate relations, I agree with the Court that in certain circumstances the two Clauses "set different standards for state conduct." *Ante*, at 220. This is one such circumstance; the Commerce Clause entails a substantive policy of unimpeded interstate commerce that is impermissibly undermined by local protectionism even when intrastate commerce is penalized as well. See *Dean Milk Co.* v. *Madison*, 340 U. S. 349, 354, and n. 4 (1951).