SALEM BLUE COLLAR WORKERS
ASSOCIATION and Stephen
Scull, Plaintiffs,

v.

The CITY OF SALEM; Mayor and Common Council of the City of Salem; Mayor Leon Johnson; City of Salem Common Council Members, John Burke; Robert Davis; Robert Elk; Betsy Erhardt; Earl Gage; Robert Johnson; Donald Sharp; and Joseph Weaver, individually and in their official capacities, Defendants.

Civ. No. 92–1137.

United States District Court,
D. New Jersey.

Sept. 13, 1993.

854

James Katz, Tomar, Simonoff, Adourian & O'Brien, Haddonfield, NJ, for plaintiffs.

David J. Puma, Waters, Sherman & Puma, P.A., Salem, NJ, for defendants.

OPINION

GERRY, Chief Judge.

This lawsuit challenges the City of Salem's municipal residency ordinance, which requires city employees to reside in the city. Plaintiffs claim that this ordinance violates the Privileges and Immunities Clause of Article IV of the United States Constitution in addition to various other provisions of the United States and New Jersey Constitutions. Plaintiffs are the Salem Blue Collar Workers Association, the collective bargaining agent for blue collar and clerical workers employed by the City of Salem, and Stephen Scull, a laborer for the City and member of the union who has been threatened with termination because he lives outside the city. They seek declaratory relief, preliminary and permanent injunctive relief, and damages against the City of Salem and various officials there-of. The case is presently before the court on cross-motions for summary judgment.

## I. *Facts*

The following facts are undisputed. The Salem residency ordinance was enacted in 1978 and provides that

> all full-time permanent and full-time, part-time officers and employees hereinafter to be employed by the City of Salem are hereby required as a condition of their employment to have their place of abode in the City of Salem and be a bona fide domiciliary therein.[1]

The ordinance has been interpreted by the City to apply only to those hired or appointed after its effective date, thus effectively "grandfathering" those who were previously employed by the City and live elsewhere. The ordinance authorizes the Mayor and Common Council "for good and sufficient cause" to waive the ordinance where residence outside of the city is required due to the health of the employee, due to the nature of the employment, or where "specialized talent or technique is required, such as professional services of engineers or accountants."

The ordinance further requires that as "a condition of employment, each and every employee or prospective employee shall be required to execute an affidavit, in [a] form prescribed by the Mayor and Common Council, setting forth ... that [the] employee is domiciled in the City." It also provides that any employee who is not a resident is to be given "a ten (10) day notice setting forth the charge that the employee is not a bona-fide resident" and therefore faces discharge.

Since the ordinance's enactment in 1978, no one has been fired for failure to comply with it.[2] It has never been discussed or

---

1. At the time the ordinance was enacted, all elected and appointed officers of municipalities in New Jersey were required to be residents of such municipalities by virtue of state law, N.J.Stat.Ann. 40A:9–1. A few months later, however, that statute was repealed and replaced by N.J.Stat.Ann. 40A:9–1.3, which provides that "the governing body of any local unit may by resolution or ordinance, as appropriate, require, subject to the provisions of this act, all officers and employees employed by the local unit after the effective date of this act to be bona fide residents therein."

2. Defendants have submitted an affidavit stating that in 1991 the Municipal Administrator confronted an employee who worked for the City as a clerk typist with an allegation that she no longer resided in the City, in violation of the ordinance. According to the affidavit, she chose to resign rather than face charges under the ordinance.

negotiated with the Union, and there is no reference to it in the parties' collective bargaining agreement. The Mayor and Common Council have never promulgated an affidavit regarding residency nor required any employee or prospective employee to execute such an affidavit, as provided for in the ordinance. The City's standard employment application asks for the prospective employee's address and includes a certification as to the accuracy of the information provided. The application does not indicate that all employees are required to be city residents, and the City provides nothing in writing to any new employee prior to hiring that indicates that municipal employment is conditioned on city residency.

The City's police officers, firefighters, and public school teachers[3] are exempted from the ordinance by operation of state law. *See* N.J.Stat.Ann. 40A:14–122.1 (precluding imposition of municipal residency ordinances on police officers); N.J.Stat.Ann. 40A:14–9.1 (firefighters); N.J.Stat.Ann. 18A:26–1.1 (teachers). Additionally, many skilled and supervisory personnel have been informally exempted from the ordinance; but none of these employees have sought or received official waivers from the Mayor and City Council.

Plaintiff Salem Blue Collar Workers Association is the collective bargaining agent for blue collar and clerical employees of the City of Salem. Some members of the Association live outside the State of New Jersey. Additionally, other members of the Association might be willing to reside outside the State of New Jersey but for the City's residency ordinance.

Plaintiff Stephen Scull was hired by the City as a laborer on November 20, 1989, at which time he was a resident of the city. He was not asked to sign an affidavit evidencing that he was a resident of the city, nor was he informed by any city official of the residency requirement. At some time thereafter, Mr. Scull moved out of Salem to another location in New Jersey because of concern for the health and safety of his children. On January 31, 1992, Kenneth Homan, Superinten-

dent of the Salem Water and Sewerage Department, told Mr. Scull that because he was residing outside the city he was in violation of the municipal residency ordinance. He was informed that he had thirty days in which to correct the violation, at which time termination proceedings would begin.

On March 9, 1992, the Salem Blue Collar Workers Association filed an Unfair Practice Charge and an Order to Show Cause before the New Jersey Public Employment Relations Commission, contending that the City of Salem violated the New Jersey Employer–Employee Relations Act, N.J.Stat.Ann. 34:13A–5.4(a)(1) & (5). On March 17, 1992, plaintiffs filed this action pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201. On April 9, 1992, the City agreed to be temporarily restrained from disciplining Stephen Scull or any other member of the Salem Blue Collar Workers Association for any violation of the residency ordinance until further order of the New Jersey Public Employment Relations Commission. Action on the Association's unfair practice charge before the Commission was postponed indefinitely pending the outcome of plaintiffs' constitutional challenge in this court.

## II. *Discussion*

Under Fed.R.Civ.P. 56, summary judgment is appropriate only if all the probative materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See, e.g., Hersh v. Allen Products Co.,* 789 F.2d 230, 232 (3d Cir.1986); *Lang v. New York Life Ins. Co.,* 721 F.2d 118, 119 (3d Cir.1983). Although the record before us contains numerous disputes as to issues of fact, none of these are material to the legal analysis of plaintiffs' claims. Thus, based on the undisputed facts presently before the court, we conclude as a matter of law that all of plaintiffs' claims must fail.

Plaintiffs primarily rest their challenge on the Privileges and Immunities Clause of Arti-

---

**3.** Defendant contends that teachers are not municipal employees, but are instead employed by the Salem Board of Education, which is an autonomous agency.

cle IV of the United States Constitution, but they also make arguments under the Equal Protection and Due Process Clauses of the Fourteenth Amendment and the equivalent clauses of the New Jersey Constitution. We address each claim in turn.

## A. *Article IV Privileges and Immunities Clause*

The Privileges and Immunities Clause of Article IV states that "[t]he citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." The Clause was intended to foster a national economic union by limiting a state's power to discriminate against residents of other states. *See, e.g., Supreme Court of N.H. v. Piper,* 470 U.S. 274, 280, 105 S.Ct. 1272, 1276, 84 L.Ed.2d 205 (1985); *Toomer v. Witsell,* 334 U.S. 385, 395–96, 68 S.Ct. 1156, 1161–62, 92 L.Ed. 1460 (1948); *Paul v. Virginia,* 75 U.S. (8 Wall) 168, 180, 19 L.Ed. 357 (1869). The Supreme Court has relied on the Privileges and Immunities Clause to invalidate a variety of state statutes that place unreasonable burdens on out-of-state citizens and whose sole basis for classification is place of residency. *See, e.g., Piper,* 470 U.S. 274, 105 S.Ct. 1272 (New Hampshire's residency requirement for admission to the bar); *Hicklin v. Orbeck,* 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978) (Alaskan statute requiring all contracts in connection with construction of Alaskan oil and gas pipelines to give preference in hiring to Alaskan residents); *Austin v. New Hampshire,* 420 U.S. 656, 95 S.Ct. 1191, 43 L.Ed.2d 530 (1975) (commuter income tax imposed only on out-of-state residents who work in state); *Doe v. Bolton,* 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (state statute prohibiting abortions performed on out-of-state residents); *Mullaney v. Anderson,* 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952) (statute of Territory of Alaska charging non-residents forty-five dollars more for commercial fishing license than residents); *Toomer,* 334 U.S. 385, 68 S.Ct. 1156 (South Carolina statute requiring non-residents to pay one hundred times more for commercial shrimp license than residents); *Ward v. Maryland,* 79 U.S. (12 Wall) 418, 20 L.Ed. 449 (1871) (Maryland statute requiring only non-resident merchants to obtain license to practice their trade, charging higher fees to non-resident than to resident merchants, and prohibiting merchants from using non-resident salesmen to sell goods in Baltimore).

■ Even though a municipal ordinance, such as Salem's, discriminates against in-state residents who live outside the city in addition to out-of-state residents, the Supreme Court has held that the Privileges and Immunities Clause is no less applicable to laws that discriminate on the basis of municipal residency than it is to laws that discriminate on the basis of state residency. *See United Bldg. & Constr. Trades Council v. Mayor & Council of Camden,* 465 U.S. 208, 215–218, 104 S.Ct. 1020, 1025–28, 79 L.Ed.2d 249 (1984). In so holding, the Court noted that while "[in-state] residents at least have a chance to remedy at the polls any discrimination against them[,] [o]ut-of-state citizens have no similar opportunity." *Id.* at 217, 104 S.Ct. at 1027 (citations omitted). Accordingly, out-of-state residents burdened by a municipal residency ordinance must be accorded the protections of the Clause.

■ Thus, while the Court held that municipal residency ordinances are subject to challenge under the Clause, it also made clear that such a challenge may only be brought by out-of-state residents. "[T]he disadvantaged [in-state] residents have no claim." *Id.* at 217, 104 S.Ct. at 1027. The complaint alleges that plaintiff, Stephen Scull, lives outside Salem but inside the State of New Jersey. Accordingly, as an in-state resident, he has no claim against the Salem ordinance under the Privileges and Immunities Clause. Summary judgment on his claim will therefore be granted in favor of defendants.

■ The Salem Blue Collar Workers Association asserts that it has members who live outside the state as well as members who might live outside the state but for the ordinance. Since this factual assertion remains unchallenged by defendants, the union does have standing to assert a Privileges and Immunities Clause claim. *See id.* at 212, n. 4, 104 S.Ct. at 1024, n. 4 (Privileges and Immunities Clause challenge to municipal ordinance cognizable where plaintiff union "has

at least some members who reside outside New Jersey"). Accordingly, we proceed to consider whether the union's rights under the Clause are violated by the Salem ordinance.

The first step in determining whether a statute or ordinance violates the Privileges and Immunities Clause is to inquire "whether the ordinance burdens one of those Privileges and Immunities protected by the Clause." *United Bldg. & Constr. Trades Council,* 465 U.S. at 218, 104 S.Ct. at 1027. Not all discrimination against out-of-state residents is prohibited. It is only with respect to those 'privileges' and 'immunities' that are "sufficiently basic to the livelihood of the Nation" and that "bear[ ] on the vitality of the Nation as a single entity," *Baldwin v. Fish & Game Comm'n,* 436 U.S. 371, 383, 388, 98 S.Ct. 1852, 1860, 1862, 56 L.Ed.2d 354 (1978), that "a State must accord residents and nonresidents equal treatment." *Piper,* 470 U.S. at 279, 105 S.Ct. at 1276. States are, for example, free to restrict voting rights to those who are citizens, and free to require those who run for public office to be citizens. *See Baldwin,* 436 U.S. at 383, 98 S.Ct. at 1860. Additionally, the Supreme Court has held that it is permissible for a state to charge more to a nonresident than to a resident for a recreational elk-hunting license, because elk-hunting is not a "means of a livelihood" and thus not fundamental to a national economic union. *See id.* at 388, 98 S.Ct. at 1862.

On the other hand, statutes that burden the ability of nonresidents "to ply their trade, practice their occupation, or pursue a common calling within the State," *Hicklin v. Orbeck,* 437 U.S. 518, 524, 98 S.Ct. 2482, 2486, 57 L.Ed.2d 397 (1978), repeatedly have been held to come within the purview of the Clause. It is plaintiffs' contention that the Salem ordinance falls within this category. Defendants argue, however, that ordinances that burden public employment are fundamentally distinguishable from ordinances that burden private employment, and that only the latter come within the purview of the Clause.

No court has directly addressed this question of whether the Clause applies to statutes burdening purely public employment. Those cases that have found employment to be protected by the Clause have generally involved government regulation of private employment. *See, e.g., Supreme Court of Va. v. Friedman,* 487 U.S. 59, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1988) (practice of law); *Piper,* 470 U.S. 274, 105 S.Ct. 1272 (same); *Mullaney v. Anderson,* 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952) (commercial fishing); *Toomer,* 334 U.S. 385, 68 S.Ct. 1156 (commercial shrimp harvesting); *Ward v. Maryland,* 79 U.S. (12 Wall) 418, 20 L.Ed. 449 (1871) (merchants); *O'Reilly v. Board of Appeals,* 942 F.2d 281 (4th Cir.1991) (driving taxi cabs); *Silver v. Garcia,* 760 F.2d 33 (1st Cir.1985) (insurance consulting); *Tangier Sound Watermen's Assoc. v. Douglas,* 541 F.Supp. 1287 (E.D.Va.1982) (commercial fishing). Additionally, the language used to describe the nature of the privileges and immunities protected by the Clause often uses words such as "commerce," "commercial," "trade," and "business," which seem to suggest private commercial activity as opposed to public or government employment. For example, the fourth article of the Articles of Confederation, from which the Privileges and Immunities Clause was derived "with no change of substance or intent," *Austin v. New Hampshire,* 420 U.S. 656, 660–61, 95 S.Ct. 1191, 1194–95, 43 L.Ed.2d 530 (1975), specifically referred to "the privileges of trade and commerce." Additionally, the Supreme Court has characterized the activities covered by the Clause as "lawful commerce, trade or business," *Ward v. Maryland,* 79 U.S. (12 Wall) 418, 20 L.Ed. 449 (1871), and "doing business," *Toomer v. Witsell,* 334 U.S. 385, 396, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948).

None of this is dispositive, of course. We cite these cases not as conclusive precedent, but simply to illustrate an apparent underlying assumption in the cases interpreting the Privileges and Immunities Clause that the types of "trades," "occupations," and "common callings" with which the Clause is concerned are those that are directly involved with the private realm of business and commerce rather than the public realm of government. This supposition has been borne

out by the Supreme Court's treatment of the public/private distinction in two more recent cases analyzing claims under the Clause, *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985), and *United Bldg. & Constr. Trades Council v. Mayor and Council of Camden*, 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984). While not directly on point, the Court's reasoning in these two cases rests on the precept that purely public employment is outside the reach of the Clause.

In *Piper* the Court considered the applicability of the Clause to the practice of law in the context of a challenge to a rule restricting admission to the bar to state residents. The language of that opinion indicates that it was the private nature of the employment involved that rendered it subject to Privileges and Immunities Clause scrutiny. The Court concluded that the practice of law was a "privilege" within the meaning of the Clause because it is "important to the national economy" and because "the 'activities of lawyers play an important part in *commercial intercourse.*'" *Id.* 470 U.S. at 281, 105 S.Ct. at 1277 (emphasis added) (quoting *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 788, 95 S.Ct. 2004, 2013, 44 L.Ed.2d 572 (1975).

The Court rejected an argument that the Clause should be inapplicable to lawyers because they are "officer[s] of the court" who "exercise[ ] state power on a daily basis," not because it took issue with the proposition that jobs involving the "exercise of state power" should be exempt from scrutiny under the Clause, but rather because it viewed lawyers more as private businessmen than public servants. *Id.* 470 U.S. at 283, 105 S.Ct. at 1277. "We conclude that a lawyer is not an 'officer' [of the court] within the ordinary meaning of that word. He 'makes his own decisions, follows his own best judgment, collects his own fees and runs his own business.'" *Id.*, (quoting *In re Griffiths*, 413 U.S. 717, 728–29, 93 S.Ct. 2851, 2858–59, 37 L.Ed.2d 910 (1973)). Thus, the Court's reasoning in *Piper* rested on an assumption that purely public employment was not a "privilege" or "immunity" protected by the Clause.

In *United Bldg. & Constr. Trades Council v. Mayor and Council of Camden*, 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) ("the Camden Case"), the Supreme Court considered whether employment by private contractors working on public works projects came within the purview of the Clause. In order to understand the Court's reasoning in this case, one must first be familiar with another Supreme Court case decided just one year previously, *White v. Massachusetts Council of Constr. Employers*, 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983). *White* involved a Commerce Clause challenge to an executive order of the Mayor of Boston requiring fifty percent of all jobs on construction projects funded by that city to be filled by city residents. In deciding whether the Commerce Clause was implicated by such a regulation, the Court found it important to determine whether the employment affected was private or public. The Commerce Clause imposes restraints on economic regulation of private parties by individual states. Thus, where a state acts as a "market regulator" (i.e. telling private employers who they can hire), the Commerce Clause is implicated. Where a state acts instead as a "market participant" (i.e., in hiring its own employees), the Commerce Clause is not implicated. *See id.* at 207, 103 S.Ct. at 1044. The Court held that the employees affected by the Boston executive order, even though working for private contractors, were essentially public employees since they were paid by city funds. Therefore, since Boston was acting as a market participant rather than a market regulator, it was not subject to the restrictions of the Commerce Clause. *Id.* at 215, 103 S.Ct. at 1048.

In the Camden case, the Supreme Court considered a very similar ordinance in the City of Camden, New Jersey, which required forty percent of the employees of private contractors and subcontractors working on city construction projects to be Camden residents. This time, however, the challenge was based on the Article IV Privileges and Immunities Clause rather than the Commerce Clause. The defendants, invoking *White*, argued that those affected were essentially public employees and that the preference for residents was therefore constitu-

tionally acceptable. The Court rejected this argument, "declin[ing] to transfer mechanically into [the context of the Privileges and Immunities Clause the analysis from *White*, which was] fashioned to fit the Commerce Clause," *id.* at 219, 103 S.Ct. at 1050, and ultimately concluded that the type of employment burdened by the Camden ordinance was "one of those Privileges and Immunities protected by the Clause," *id.* at 218, 221, 103 S.Ct. at 1050, 1051.

That holding is not controlling here since the case before us involves direct government employment rather than employment by government contractors. In holding that the quasi-public employment at issue in the Camden case was protected by the Clause, the Supreme Court did not conclusively answer the question we face: whether purely public employment is embraced by the Clause. An examination of the reasoning employed by the Court to reach its holding, however, should shed some light on that question. Did the Court conclude that the employment burdened by the Camden ordinance came within the Clause because all employment, whether private or public, comes within the Clause—or because it was distinguishable from purely public employment?

Plaintiffs and defendants interpret the Court's reasoning differently on this score, and both parties have been able to find language in the opinion to support their opposing arguments. Plaintiffs argue that the Supreme Court's refusal to apply the *White* analysis in the Camden Case means that the public/private distinction has no relevance to Privileges and Immunities Clause analysis, and that burdens on all types of employment, whether private or public, implicate the Clause. Defendants argue that the Court's rejection of *White* was not a wholesale rejection of the public/private distinction itself, but merely a refusal to adopt the specific criteria set forth in *White* for determining whether a particular employment is more properly characterized as public or private. According to their interpretation, the Court found the Clause to apply to the Camden ordinance because it found employment by government contractors to be more properly

characterized as private than public in this context. For the reasons set forth below, we find defendants' reading of the opinion more persuasive.

The Court began its analysis in the Camden case with two observations, which are critical to an understanding of its subsequent reasoning. First it stated that "[p]ublic employment ... is qualitatively different from employment in the private sector." *Id.* at 219, 103 S.Ct. at 1050. It then went on to state, "[i]t can certainly be argued that for purposes of the Privileges and Immunities Clause everyone affected by the Camden ordinance is also 'working for the city' and, *therefore, has no grounds for complaint when the city favors its own residents." Id.* (emphasis added). These initial observations set up two precepts on which the subsequent analysis rests. The first is that the distinction between public and private employment is significant. The second is that someone who is in fact "working for the city" (a public employee) has no grounds for complaint under the Privileges and Immunities Clause; in other words, purely public employment is outside the purview of the Clause.

It is the passage immediately following this second observation on which plaintiffs rely most heavily for their argument that the Supreme Court viewed the private/public employment distinction as irrelevant to the Privileges and Immunities Clause analysis. But we decline to transfer mechanically into this context an analysis fashioned to fit the Commerce Clause. Our decision in *White* turned on a distinction between the city acting as a market participant and the city acting as a market regulator. The question whether employees of contractors and subcontractors on public works projects were or were not, in some sense, working for the city was crucial to that analysis. The question had to be answered in order to chart the boundaries of the distinction. But the distinction between market participant and market regulator relied upon in *White* to dispose of the Commerce Clause challenge is not dispositive in this context. The two Clauses have different aims and set different standards for state conduct.

*Id.* at 219–20, 103 S.Ct. at 1050–51. The Court went on to explain that the market participant/regulator distinction is important in the Commerce Clause context because the purpose of that Clause is to avoid conflict between federal and state regulation. The Privileges and Immunities Clause, on the other hand, while also aimed at prohibiting barriers to commerce between the individual states, is rooted more in the individual's right to travel from state to state to pursue her livelihood. *Id.* at 220, 103 S.Ct. at 1051. Thus, while the Commerce Clause focuses on the actions of the state or municipality (as either market regulator or market participant), the Privileges and Immunities Clause focuses on the right of the individual employee to pursue her livelihood.

Plaintiffs read this passage as rejecting entirely any consideration of the distinction between public and private employment in the context of the Privileges and Immunities Clause. A better reading of this passage, however, interprets it not as rejecting the private/public employment distinction entirely, but rather as rejecting the particular approach the Court took in *White* to decide whether employment by private contractors using public funds constituted public or private employment. Nowhere in this passage did the Court use the words "public" or "private." Rather, it discussed the "distinction between the city acting as a market participant and the city acting as a market regulator." *Id.* at 219, 103 S.Ct. at 1050. This was the test the Court devised in *White* to draw the line between public and private employment. In refusing to apply the *White* test to the Camden case, the Court was simply saying that the line between public and private would not necessarily be drawn in the same place when the Privileges and Immunities Clause was at issue as when the Commerce Clause was at issue.

Later in the opinion, the Court stated: The fact that Camden is expending its own funds ... in accordance with the terms of

a grant is certainly a factor—perhaps the crucial factor—to be considered in evaluating whether the statute's discrimination violates the Privileges and Immunities Clause. But it does not remove the Camden ordinance completely from the purview of the Clause....

*Id.* at 221, 103 S.Ct. at 1051. "The fact that Camden is expending its own funds" under the *White* analysis is what would have made it a market participant and what therefore would have pushed the employment at issue over the line into the public sphere. In the Camden case, while it was a factor to be considered, "the fact that Camden [was] expending its own funds" was not enough in itself to render the employment public and thus did not completely remove it from the purview of the Clause.

Finally, the language used by the Court in concluding its analysis indicates that it was ultimately the private nature of the employment at issue in the Camden case that brought it within the purview of the Privileges and Immunities Clause. According to the Court, "[t]he opportunity to seek employment with such *private employers* is 'sufficiently basic to the livelihood of the Nation' as to fall within the purview of the Privileges and Immunities Clause *even though the contractors and subcontractors are themselves engaged in projects funded in whole or part by the city.*" *Id.* at 221–22, 103 S.Ct. at 1051–52 (emphasis added) (quoting *Baldwin v. Mont. Fish & Game Comm'n*, 436 U.S. 371, 388, 98 S.Ct. 1852, 1862, 56 L.Ed.2d 354 (1978). Thus, the same type of employment that the Court considered public for purposes of the Commerce Clause was considered private for purposes of the Privileges and Immunities Clause.[4] The Court's original precept that those who are in fact "working for the city" have no cause to complain remained true, but the test for determining whether someone is working for the city had changed.

---

4. This is consistent with the Court's view that the Commerce Clause focuses on the perspective of the state or local government while the Privileges and Immunities Clause focuses on the perspective of the individual. *See supra* at 860. Thus, from the perspective of the Cities of Boston or

Camden, the employment involved in these two cases would appear public, since the cities were disbursing public funds. From the perspective of the employee hired by a private contractor, however, the employment would appear private.

Thus, while isolated passages of the Court's opinion in the Camden case may appear to support plaintiffs' position when read out of context, a careful reading of the case as a whole demonstrates that the Court did not view the public/private distinction as irrelevant to the Privileges and Immunities Clause analysis. Rather, the Court's reasoning rested on a presumption that purely public employment would be beyond the reach of the Clause.

Such a precept is consistent with the Clause's purposes of preventing barriers to free trade and commerce between the states and creating a single economic union. There are significant differences between a state imposing restrictions on its own workers—as any employer has certain latitude to do—and a state forcing private employers to impose restrictions on their employees. The latter involves government restraint on the liberty of the private employers affected, and additionally has a much broader and more comprehensive impact on free trade and commerce between the states. Thus, the type of state regulation of private employment that is typically struck down under the Clause imposes a blanket burden on all persons attempting to pursue a certain livelihood. The Salem ordinance, in contrast, only affects those people seeking employment with one small employer in the state: the City of Salem. When Maryland charges more for a commercial fishing license to out-of-state residents than to state residents, anyone from out of state wishing to pursue fishing as a livelihood in Maryland is burdened. When, on the other hand, the City of Salem chooses to impose a residency requirement on clerical employees, all out-of-state residents wishing to pursue a livelihood as a secretary in New Jersey are not burdened. Indeed, the vast majority of secretarial jobs in the state remain open to out-of-state residents. Thus, commerce as a whole is not significantly affected.

Whether municipal employment comes within the purview of the Privileges and Immunities Clause presents an issue of first impression. Because Supreme Court dicta indicates that public employment is not subject to the protections of the Clause, and because we find that application of the Clause in a situation such as this—where the jobs affected represent a negligible percentage of the state's total job market—would be antithetical to the purposes and policies that animate it, we hold that the employment burdened by the Salem residency ordinance is not a "privilege" or "immunity" within the meaning of the Clause. Summary judgment is therefore granted in favor of defendants on this claim.

### B. *Equal Protection Challenge*

 Plaintiffs also challenge the ordinance under the Equal Protection Clause of the Fourteenth Amendment. Since the ordinance does not affect a fundamental right[5] or discriminate against a protected group for purposes of equal protection analysis, plaintiffs acknowledge that the ordinance must be measured against the least strict of the equal protection standards: the rational basis test. *See, e.g., City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439–41, 105 S.Ct. 3249, 3253–55, 87 L.Ed.2d 313 (1985); *Schweiker v. Wilson*, 450 U.S. 221, 230, 101 S.Ct. 1074, 1080, 67 L.Ed.2d 186 (1981); *Dandridge v. Williams*, 397 U.S. 471, 483–87, 90 S.Ct. 1153, 1160–63, 25 L.Ed.2d 491 (1970). "[L]egislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254. Thus, the burden rests on those challenging the classification to show that it is not rationally related to its purpose. *See New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976) (per curiam).

 "The State may not rely upon a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446, 105 S.Ct. at 3257. On the other hand, "[i]f [a] classification has some 'reasonable basis,' it does not offend

---

**5.** *See United Bldg. & Constr. Trades Council*, 465 U.S. at 219, 104 S.Ct. at 1028 (no fundamental right to government employment).

the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in· some inequality.'" *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (quoting *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911)). "[T]here is no constitutional requirement that regulations must cover every class to which they might be applied." *Wardwell v. Board of Educ.,* 529 F.2d 625, 629 (6th Cir.1976).

The Supreme Court has held that municipal residency ordinances similar to Salem's are not irrational *per se. See McCarthy v. Philadelphia Civil Serv. Comm'n,* 424 U.S. 645, 646, 96 S.Ct. 1154, 1154, 47 L.Ed.2d 366 (1976); *Detroit Police Officers Ass'n v. City of Detroit,* 405 U.S. 950, 92 S.Ct. 1173, 31 L.Ed.2d 227 (1972) (dismissing for lack of federal question appeal of decision by Supreme Court of Michigan rejecting equal protection challenge to municipal residency ordinance); *see also Wardwell,* 529 F.2d at 628; *Ahern v. Murphy,* 457 F.2d 363 (7th Cir. 1972); *Ector v. City of Torrance,* 10 Cal.3d 129, 109 Cal.Rptr. 849, 514 P.2d 433 (1973), *cert. denied,* 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974); *Kennedy v. City of Newark,* 29 N.J. 178, 148 A.2d 473 (1959). Plaintiffs, however, do not argue that the classification between residents and non-residents inherent in any residency ordinance is irrational. Rather, they make a more particularized claim that the Salem ordinance is irrational to the extent that it contains so many exceptions and loopholes: police officers, fire fighters, and teachers are exempted; as well as many supervisory officials.[6] They argue that there is no rational reason why clerical and blue collar workers should be required to be Salem residents, while virtually every other employee is exempted. Moreover, they argue that the exemption of employees hired before 1978, under the grandfather provision of the ordinance, is not rationally related to any legitimate purpose.

 The exemptions of police officers, firefighters, and teachers are not written into the Salem ordinance itself, but rather are mandated by state law. *See* N.J.Stat.Ann. 40A:14–122.1 (precluding imposition of municipal residency ordinances on police officers); N.J.Stat.Ann. 40A:14–9.1 (firefighters); N.J.Stat.Ann. 18A:26–1.1 (teachers). Since these classifications are created by state statutes, rather than the municipal ordinance, it is not clear that they are properly challenged in this lawsuit which is against the municipality only. *See Trainor v. City of Newark,* 145 N.J.Super. 466, 368 A.2d 381, 386 (App.Div.1976). Moreover, the legislative history behind these statutes indicates that they were passed because municipal residency requirements made the recruitment of new employees more difficult. *See id.* 148 A.2d at 475. This is a legitimate purpose to which the exemption of police and fire fighters is rationally connected.

 The exemptions of supervisory officials are not mandated by state law, although some such exemptions are explicitly permitted by state statute.[7] The exemption of these positions also meets the rational basis test, however, since such positions require people with special education and skills who may not be available among the pool of Salem residents.

 Finally, the distinction created by the grandfather clause between employees hired before and after 1978 serves a rational purpose by protecting the legitimate expectations of those hired before the residency ordinance's enactment, who had no warning of it prior to accepting municipal employ-

---

**6.** These supervisory officials include the superintendent of the Water and Sewerage Department, the city building officer, the city engineer, the municipal attorney, a judge of the Salem Municipal Court, and the city's chief financial officer. There is a dispute between the parties as to whether or not the city administrator resides in the city.

**7.** *See* N.J.Stat.Ann. 40A:9–1.1 (a "municipality may ... appoint to the office of director of public

safety a nonresident of said municipality"); N.J.Stat.Ann. 40A:9–1.2 (same for municipal treasurer); N.J.Stat.Ann. 40A:9–11 ("A nonresident of any municipality may hold office as counsel, attorney, engineer, health officer, auditor, or comptroller of such municipality"); N.J.Stat. Ann. 2A:8–7 ("A magistrate who is an attorney at law need not be a resident of the municipality or municipalities to which the jurisdiction of the court extends").

ment. We therefore find that it withstands minimum scrutiny as well. We are not alone in so holding. *See Lorenz v. Loque*, 611 F.2d 421, 423 (2d Cir.1979); *Wardwell v. Bd. of Educ.*, 529 F.2d 625, 629 (6th Cir.1976).

### C. Due Process Challenges

Plaintiffs assert five claims which they characterize as Fourteenth Amendment Due Process challenges to the ordinance. On the basis of the undisputed facts presently before us we find each of these claims is without merit as a matter of law.

■ Plaintiffs' first claim alleges "selective enforcement" of the Salem residency ordinance. They assert that since the ordinance's enactment in 1978, Salem has not attempted to enforce it except against plaintiff, Stephen Scull.[8] Defendant contests the factual accuracy of this assertion; but even assuming plaintiffs' version of the facts to be correct, we find no constitutional violation.

■ It is well-established that "'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Bordenkircher v. Hayes*, 434 U.S. 357, 368–69, 98 S.Ct. 663, 670–72, 54 L.Ed.2d 604 (1978) (quoting *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 505, 7 L.Ed.2d 446 (1962)). To state such a claim, there must be evidence of intentional and purposeful discrimination on the part of the government. *United States v. Torquato*, 602 F.2d 564, 570 (3d Cir.), *cert. denied*, 444 U.S. 941, 100 S.Ct. 295, 62 L.Ed.2d 307 (1979).[9]

Otherwise, the mere fact that certain persons have been permitted to violate the ordinance or statute without prosecution does not preclude the government from enforcing it against others. *Abrahams v. Civil Serv. Comm'n*, 65 N.J. 61, 319 A.2d 483, 490 (1974). Here plaintiffs have not adduced any evidence, nor do they allege that the City's failure to enforce the ordinance except against Stephen Scull was purposeful and intentional and "deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Bordenkircher*, 434 U.S. at 369, 98 S.Ct. at 670. Therefore, we find no constitutional violation.

■ Plaintiffs' second argument is that the City committed a due process violation by its failure to provide Stephen Scull with written or oral notice of the residency requirement at the time he was hired. First, we note that this is not a standard procedural due process claim challenging the government's removal of an entitlement without providing notice and an opportunity to be heard. Plaintiffs do not dispute that Stephen Scull was provided advance notice and an opportunity to be heard regarding the City's intent to terminate him for violation of the ordinance. Rather, they argue that due process standards required the City to give Mr. Scull notice of the ordinance before he was hired. Plaintiffs have offered no legal authority in support of this argument. In the absence of any authority to the contrary, we must adhere to the age-old maxim that ignorance of the law is no excuse. That rule "is 'deeply rooted in the American legal system,' and exceptions to it must not be casually created."[10] *United States v. Rogers*, 962

---

8. We note that although plaintiffs characterize their claim as a due process violation, claims of selective prosecution are usually analyzed under equal protection standards.

9. Although *Bordenkircher*, *Oyler*, and *Torquato* involved selective prosecution of a criminal statute, we find application of the same standard dispositive in this case. If there is any difference between the standards for selective enforcement of civil and criminal statutes, it must be that the government is held to a higher degree of scrutiny in the criminal context since the deprivation at stake is so much more severe. Accordingly, to the extent we find that the City has not violated the more stringent criminal standard, we can be sure that it has not violated the civil standard.

10. The Supreme Court has only "recognized certain very limited circumstances in which a State's reliance on the maxim that a man may be presumed to know the law is not consistent with the restrictions imposed by the Constitution on legislative action." *Texaco v. Short*, 454 U.S. 516, 545, 102 S.Ct. 781, 800, 70 L.Ed.2d 738 (1982) (Brennan, J. dissenting). Thus, in *Lambert v. California*, 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957), the Court held that a municipal ordinance which made it an offense for any convicted felon to remain in the city for more than five days without registering with the police violated due process standards when applied to someone who neither knew nor could reasonably be expected to know of her legal obligation.

F.2d 342, 344 (4th Cir.1992) (quoting *Cheek v. United States*, 498 U.S. 192, 198, 111 S.Ct. 604, 609, 112 L.Ed.2d 617 (1991)); *accord*, *United States v. International Minerals and Chem. Corp.*, 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971). Thus, to the extent that notice of the residency requirement prior to hiring was constitutionally required, we hold that the existence of the statute itself was sufficient to provide such notice.

Third, plaintiffs argue that the ordinance is void for vagueness. A law will be struck down on vagueness grounds where it "lacks explicit standards for its application, and this impermissibly delegates basic policy matters to [government officials] for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298, 33 L.Ed.2d 222 (1972). Plaintiffs argue that this ordinance is void for vagueness because "the Mayor and Council have complete discretion in authorizing exemptions from Salem's resident preference, [and] the City has failed to adopt standards for the granting of such exemptions."[11] In fact, however, the Mayor and Council do not have "complete discretion" because the statute itself sets forth explicit standards for the granting of exemptions. The ordinance states:

> EXCEPTIONS. The Mayor and Common Council are hereby authorized in their discretion for good and sufficient cause being shown, to permit any officer or employee of the City of Salem to remain in the employ of the City without complying with the provisions hereof where:
>
> [a] The health of any officer or employee necessitates residence outside the City limits;
>
> [b] The nature of employment is such as to require residence outside the City;

> [c] Specialized talent or technique is required such as professional services of engineer [sic] or accountants

Indeed, the New Jersey Supreme Court has held that a municipal residency ordinance worded nearly identically to this one would not be impermissibly vague. In *Abrahams v. Civil Serv. Comm'n*, 65 N.J. 61, 319 A.2d 483 (1974), the exceptions provision of a Newark residency ordinance was challenged on vagueness grounds under the United States Constitution. That ordinance contained categories for exemptions nearly identical to [a] and [b] above, in addition to a third category permitting an exemption where "[s]pecial circumstances attach." *Id.* 319 A.2d at 484. The court held the last category void for vagueness, but found the first two categories sufficiently specific to adequately guide the discretion of the responsible officials. *Id.* at 489–90. Moreover, the court noted that had the third category specified the meaning that city officials attributed to the words "special circumstances," it would also have been sufficient to withstand the vagueness challenge. The "meaning" the court referred to was strikingly similar to section [c] of the Salem ordinance: "special talent or technique which is necessary for the operation of government not found among Newark residents." *Id.* We agree with the New Jersey Supreme Court that this language provides sufficient limits on official discretion to survive a vagueness challenge.

Fourth, plaintiffs make a cursory attempt to invoke the substantive due process right to *intra*-state travel recently recognized by the Third Circuit in *Lutz v. City of York*, 899 F.2d 255, 270 (3d Cir.1990). We fail to see how the holding in *Lutz* offers any support to plaintiff's claim, however. There the court held that the right "to move freely about one's neighborhood or town . . . is indeed 'implicit in the concept of ordered liberty' and 'deeply rooted in the Nation's history,'" and thus subject to substantive due process

---

Critical to the Court's holding in that case, however, was the fact that the defendant had been given no opportunity to comply with the law and avoid its penalty upon first being made aware of its existence. *Id.* at 229, 78 S.Ct. at 243. In this case, Stephen Scull has been given the option of moving back into Salem to comply with the

municipal residency ordinance. *See* Affidavit of Thomas G. Smith, ¶ 14; Affidavit of Stephen Scull, ¶ 6.

11. Plaintiffs' brief at 58.

protection. *Id.* at 268 (quoting *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937) and *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1937, 52 L.Ed.2d 531 (1977)). The court further held that a municipal ordinance outlawing "cruising" (consisting of "driving repeatedly around a loop of certain major public roads through the heart of the city," *id.* at 256) burdened this right and was therefore subject to intermediate scrutiny. We see no reason to presume that the limited right recognized by the Third Circuit in that case, to move freely about one's neighborhood, would encompass the right that plaintiffs claim here: to commute from outside Salem to a job with the Salem government. Accordingly, we find this claim to be without merit as well.

 Fifth and finally, plaintiffs argue that the City of Salem acted *ultra vires* in enacting the ordinance and that it is therefore void. According to this argument, the City of Salem is a creature of the state legislature and therefore has no powers beyond those provided by the state. Because state law provides that an employee who violates a municipal residency ordinance shall be given six months to resume residency before termination procedures begin, *see* N.J.S.A. 40A:9–1.5, plaintiffs argue that Salem's ordinance, which provides only ten days' notice, is *ultra vires. See City of Trenton v. New Jersey,* 262 U.S. 182, 187, 43 S.Ct. 534, 536, 67 L.Ed. 937 (1923). Plaintiffs characterize this as a federal due process violation but do not cite any authority for that characterization.

Defendant argues that Salem's ordinance pre-dates N.J.Stat.Ann. 40A:9–1.5, and therefore is not bound by it. Indeed, the statute states at N.J.Stat.Ann. 40A:9–1.9,

> The provisions of this act shall apply to all residency requirements adopted on and after the effective date of this act. Nothing herein shall be construed to alter, abrogate, repeal or otherwise affect any residency requirement in effect in any local unit by ordinance ... on the effective date of this act [June 30, 1978].

Plaintiffs argue in response that since the enabling legislation under which Salem's or-dinance was originally enacted has now been repealed, the City must comply with the current statutory provision, but they offer no authority for this proposition. In the absence of any such authority we are understandably disinclined to disregard the apparently clear import of the statutory language cited above. Accordingly, we find this claim without merit as well.

Finally, plaintiffs assert that to the extent the ordinance violates the federal constitution it also violates the state constitution. Since we find no federal constitutional violation, and plaintiffs have given us no reason to believe that the New Jersey Constitution's reach is broader than that of the federal constitution with respect to these claims, summary judgment is also granted to defendants with respect to plaintiffs' claims under the New Jersey Constitution.

## III. *Conclusion*

For the reasons set forth above, we find that there are no disputed issues of material fact and that as a matter of law Salem's residency ordinance does not violate the Privileges and Immunities Clause of Article IV, the Equal Protection or Due Process Clauses of the Fourteenth Amendment to the United States Constitution, or any provisions of the New Jersey Constitution. We therefore grant summary judgment in favor of defendants as to all counts.

### ORDER

This matter having come before the court on motion by plaintiffs for summary judgment and cross-motion by defendants for summary judgment, and the court having considered the submissions of the parties, and for good cause shown;

It is, this 13th day of September, 1993, hereby ORDERED that plaintiffs' motion is DENIED and defendants' motion is GRANTED. Summary judgment is therefore entered in favor of defendants on all counts.