33 F.3d 265
 63 USLW 2134
 SALEM BLUE COLLAR WORKERS ASSOCIATION and Stephen Scull, Appellants,
v.
CITY OF SALEM; Leon Johnson, Mayor of the City of Salem;
John Burke, Common Council Member of the City of Salem;
Robert Davis, Common Council Member of the City of Salem;
Robert Elk, Common Council Member of the City of Salem;
Betsy Erhardt, Common Council Member of the City of Salem;
Earl Gage, Common Council Member of the City of Salem;
Robert Johnson, Common Council Member of the City of Salem;
Donald Sharp, Common Council Member of the City of Salem;
Joseph Weaver, Common Council Member of the City of Salem,
individually and in their official capacities, Appellees.
 No. 93-5622.
 United States Court of Appeals,
Third Circuit.
 Argued May 2, 1994.
Decided Aug. 25, 1994.
Sur Petition for Rehearing Sept. 28, 1994.
 
 James Katz (Argued), Tomar, Simonoff, Adourian & O'Brien, P.C., Haddonfield, NJ, for appellants.
 David J. Puma (Argued), Waters, Sherman & Puma, P.A., Salem, NJ, for appellees.
 BEFORE: SLOVITER, Chief Judge, HUTCHINSON and SEITZ, Circuit Judges.
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 I.
 
 1
 Plaintiffs appeal a final order of the district court granting summary judgment to defendants in a civil rights action attacking the constitutionality of a city ordinance requiring employees of the city, with certain exceptions, to live therein. Our review is plenary.
 
 II.
 
 2
 The individual plaintiff ("Scull") was employed by the City of Salem, New Jersey ("City") as a laborer. He moved his residence from the city to suburban New Jersey, giving as his reason the health, safety, and welfare of his family. He was notified that such action was in violation of the city's residential requirement and he would be terminated if he did not correct the situation. Scull would not comply and this action to bar his discharge followed.
 
 
 3
 Section 2 of the Salem Municipal Residency Ordinance recites that
 
 
 4
 Except as otherwise provided by law, all full-time permanent and full-time, parttime officers and employees hereinafter to be employed by the City of Salem, are hereby required as a condition of their employment to have their place of abode in the City of Salem and be a bona fide domiciliary therein.
 
 
 5
 Joint Appendix ("JA") 38 (Ordinance # 78-3).
 
 
 6
 The preamble to the ordinance cites the following reasons for the requirement:
 
 
 7
 Whereas, said residency will not only reduce the high unemployment rate in the City, but will also improve relations among City employees; enhance the quality of employee performance by greater personal knowledge of conditions and problems in the City; promote a feeling of greater personal interest in the City's progress; reduce the possibility of tardiness and absenteeism; provide a ready availability of trained manpower for emergency situations; and provide unto the City economic benefits....
 
 
 8
 JA 25.
 
 
 9
 Salem Blue Collar Workers Association ("Association"), the collective bargaining agent for the blue-collar and clerical employees of the City of Salem, and Scull filed a four-count complaint in the district court seeking, inter alia, declaratory and injunctive relief barring enforcement of the ordinance. They alleged that the ordinance violates the Privileges and Immunities Clause of Article IV, Sec. 2 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.
 
 
 10
 The parties then filed cross-motions for summary judgment. The district court held that the ordinance did not violate either constitutional provision and granted summary judgment to defendants. Plaintiffs' appeal followed.
 
 III.
 A. The Privileges and Immunities Clause
 
 11
 The Privileges and Immunities Clause of the United States Constitution provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." U.S. Const. art. IV, Sec. 2. The purpose of the Clause was to foster a national union by discouraging discrimination against residents of another state on the basis of citizenship. See Paul v. Virginia, 75 U.S. (8 Wall.) 168, 180, 19 L.Ed. 357 (1869).
 
 
 12
 Despite the language of the Clause embracing "each State," the United States Supreme Court has recently held that the Clause may include municipal residency ordinances. United Bldg. & Constr. Trades Council v. Mayor & Council of Camden, 465 U.S. 208, 214-15, 104 S.Ct. 1020, 1025-26, 79 L.Ed.2d 249 (1984). The Court's rationale for this expansive reading of the Clause is based on the relationship between the state and its municipality: since a municipality is granted its power to act from the state, it is as subject to the Clause as the state would be.
 
 1. Standing
 
 13
 The district court granted summary judgment to the City on Scull's privileges and immunities claim because it concluded that he lacked standing. Salem Blue Collar Workers Ass'n v. City of Salem, 832 F.Supp. 852, 856 (D.N.J.1993). In so concluding, the district court relied on language in the Supreme Court's opinion in the Camden case. There the Court stated that "[i]t is true that New Jersey citizens not residing in Camden will be affected by the ordinance as well as out-of-state citizens. And it is true that the disadvantaged New Jersey residents have no claim under the Privileges and Immunities Clause." Id. at 217, 104 S.Ct. at 1027 (citing The Slaughter-House Cases, 83 U.S. (16 Wall.) 36, 74-75, 21 L.Ed. 394 (1872)). The implication from this language is that individual New Jersey residents have no standing to challenge a New Jersey municipal ordinance. The district court's ruling here is consistent with the Supreme Court's analysis in Camden. Thus, Scull lacked standing to assert a privileges and immunities claim.
 
 
 14
 In contrast to its ruling in regard to Scull, the district court concluded that the Association had standing on its privileges and immunities claim because the complaint alleged that the Association was comprised, inter alia, of members who lived outside the State of New Jersey and others who might live outside the state but for the ordinance.[1] Salem, 832 F.Supp. at 856. The Court in Camden noted that one of the member associations that belonged to the Council in Camden had "at least some members who reside outside New Jersey," 465 U.S. at 212 n. 4, 104 S.Ct. at 1024 n. 4, and thus had standing. On that basis we agree with the district court's ruling on the Association's standing and proceed to its privileges and immunities claim.
 
 
 15
 2. Privileges and Immunities Clause Analysis
 
 
 16
 A valid privileges and immunities claim requires proof of two elements: (1) whether the interest or right being burdened is "fundamental" and thus, protected by the Clause, see The Slaughter-House Cases, 83 U.S. (16 Wall) at 76; and (2) if it is, whether there are "substantial" reasons for the discrimination and "whether the degree of discrimination bears a close relation to them," Toomer v. Witsell, 334 U.S. 385, 396, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948).
 
 
 17
 We first decide whether the right being burdened--direct public employment--is one that is "fundamental." As the Supreme Court stated in Baldwin v. Fish & Game Commission, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354 (1978), "[o]nly with respect to those 'privileges' and 'immunities' bearing upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally." Id. at 383, 98 S.Ct. at 1860. The Court's formulation of the controlling standard is but the beginning of analysis.
 
 
 18
 Up to this point in time, the Supreme Court has dealt only with prohibitions involving the practice of trades and businesses--private employment. See, e.g., Supreme Court of N.H. v. Piper, 470 U.S. 274, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985) (the practice of law);[2] Hicklin v. Orbeck, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978) (occupations downstream from state-owned oil and gas interests); Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948) (commercial shrimp fishing); Ward v. Maryland, 79 U.S. (12 Wall.) 418, 20 L.Ed. 449 (1871) (merchants); cf. Baldwin, 436 U.S. at 388, 98 S.Ct. at 1862-63 (rejecting argument that recreational moose hunting is a fundamental right deserving of the Clause's protection).
 
 
 19
 The focus of our analysis is on the proposition that the right to pursue a "common calling" is within the purview of the Privileges and Immunities Clause. Hicklin v. Orbeck, 437 U.S. at 524, 98 S.Ct. at 2487 (stating that the "protection of the Clause is strongly supported by this Court's decisions holding violative of the Clause state discrimination against nonresidents seeking to ply their trade, practice their occupation, or pursue a common calling within the State"); Toomer, 334 U.S. at 403, 68 S.Ct. at 1165 (commercial shrimping is within the scope of the Clause).
 
 
 20
 Because of the commercial nature of the term "common calling," early Court decisions looked to the Commerce Clause for guidance in their analyses, citing the "mutually reinforcing relationship between the Privileges and Immunities Clause of Article IV, Sec. 2, and the Commerce Clause." Hicklin, 437 U.S. at 524, 98 S.Ct. at 2487.[3] In White v. Massachusetts Council of Construction Employers, Inc., 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983), the Court reviewed, under the Commerce Clause, the constitutionality of an executive order issued by the Mayor of Boston that required all construction projects funded in whole or in part by city funds to employ a work force at least half of whom were residents of the city. The Court held that the City was acting in a proprietary capacity and was a market participator, not a market regulator, and therefore was not in violation of the restraints of the Commerce Clause. It is significant to note that in dicta the Court said that the executive order affected the contractual relationship between the contractors and their employees, and as such, the employees were actually "working for the city." Id. at 211 n. 7, 103 S.Ct. at 1046 n. 7. Thus, they did not have the benefit of the Privileges and Immunities Clause when Boston favored its own citizens.
 
 
 21
 In Camden, the Supreme Court came close to deciding the issue of whether public employment is a "fundamental" privilege protected by the Privileges and Immunities Clause. Camden involved a challenge to a city ordinance that required at least 40% of the employees of the contractors and subcontractors working on city projects to be Camden residents. The Court stated that the threshold determination was "whether an out-of-state resident's interest in employment on public works contracts in another State is sufficiently 'fundamental' to the promotion of interstate harmony so as to 'fall within the purview of the Privileges and Immunities Clause.' " Camden, 465 U.S. at 218, 104 S.Ct. at 1027 (quoting Baldwin, 436 U.S. at 388, 98 S.Ct. at 1862-63).
 
 
 22
 The Court refused to "mechanically" adopt the Commerce Clause analysis used in White. Id. at 219, 104 S.Ct. at 1028.[4] The Association contends that the Court's rejection of the White rationale signals a rejection of the public/private distinction in the area of employment. Closer scrutiny of the Court's reasoning in Camden, however, suggests otherwise.
 
 
 23
 Despite the Court's refusal to apply the White analysis, the public/private distinction survives as we read the Camden decision. Camden first stated that the pursuit of a common calling is a fundamental privilege protected by the Clause, id. at 219, 104 S.Ct. at 1028, but then drew a clear distinction between public and private employment by stating that "[p]ublic employment ... is qualitatively different from employment in the private sector; it is a subspecies of the broader opportunity to pursue a common calling," id.
 
 
 24
 Although Camden refers to public employment as a "subspecies" of "common callings," the public/private distinction can be justified on the basis of the history of the language associated with the clauses. The Privileges and Immunities Clause traces its origin to the language employed in the Fourth Article of the Articles of Confederation. That Article used terms that were referable to private employment, e.g., "trade" and "commerce." See David S. Bogen, The Individual Liberties Within the Body of the Constitution: A Symposium: The Privileges and Immunities Clause of Article IV, Case W.Res.L.Rev. 794, 831 (1987) (suggesting that "[d]espite uncertainty, one function of article IV ... remained clear: it prohibited states from imposing any restriction not applicable to residents on nonresidents engaged in trade or commerce").
 
 
 25
 When the articles of the Constitution were drafted, the language of both the Privileges and Immunities Clause and the Commerce Clause was taken from the Fourth Article of the Articles of Confederation. It is on this historical basis that the distinction between public and private employment remains viable here. See Thomas H. Day, Note, Hiring Preference Acts: Has the Supreme Court Rendered Them Violations of the Privileges and Immunities Clause?, 54 Fordham L.Rev. 271, 278 (1985) (discussing the distinction the Court has drawn between private and government employment); see also Bogen, supra at 856 (stating that "[t]he right to engage in a trade or business is a privilege or immunity of citizenship"); Mark P. Gergen, The Selfish State and the Market, 66 Tex.L.Rev. 1097, 1129 (1988) (noting that early cases striking down state laws under the Privileges and Immunities Clause involved the "core privileges of trade and commerce").
 
 
 26
 Based on this historical foundation, we ask whether private or public employment is implicated by Scull's employment with the City of Salem. Our analysis turns on the nature of the employment relationship between employer and employee, not the character of the job being performed.
 
 
 27
 The Court in Camden held that a private employment relationship existed there. In Camden, the contractors and subcontractors were working under contract to the City and being paid in part or whole with city funds. White suggested that the employees of the contractors could be considered to be "working for the city" and therefore, have no claim. The Camden Court, however, refused to apply White's Commerce Clause reasoning citing the employees' right to "seek employment with ... private employers." Id. 465 U.S. at 221, 104 S.Ct. at 1029 (emphasis added).[5]
 
 
 28
 Our case is distinguishable by comparing the direct and indirect nature of the government employment. The employment in our case is directly with the governmental entity--there is no intervening private employment as there was in White, where the contractors and subcontractors were under contract to the City of Boston, but the individual employees were under contract to the contractors and subcontractors. The Camden court recognized this distinction when it concluded that "[t]he opportunity to seek employment with such private employers is 'sufficiently basic to the livelihood of the Nation,' ... as to fall within the purview of the Privileges and Immunities Clause even though the contractors and subcontractors are themselves engaged in projects funded in whole or part by the city." Id. at 221-22, 104 S.Ct. at 1029 (quoting Baldwin, 436 U.S. at 388, 98 S.Ct. at 1863).
 
 
 29
 We agree with the district court in this case that the public/private distinction has not been abandoned. Based on our reading of the Supreme Court cases in this area, we hold that direct public employment is not a privilege or fundamental right protected by the Privileges and Immunities Clause of Article Four.
 
 
 30
 In light of our holding that there is no fundamental right implicated here, it is unnecessary for this court to discuss the second issue of "substantial relatedness."[6]B. Equal Protection Challenge
 
 
 31
 Plaintiffs[7] argue in the alternative that the ordinance, as it is applied by the City, violates the Equal Protection Clause of the Fourteenth Amendment.
 
 
 32
 At the outset, plaintiffs concede that the "rational basis" test is to be used in the analysis of their due process claim because the ordinance does not affect a fundamental right, see Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976), and does not discriminate against a suspect class.
 
 
 33
 The Equal Protection Clause directs that "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). To withstand constitutional scrutiny under the rational basis test, the classifications created by the legislation "must be rationally related to a legitimate governmental purpose." Id. at 446, 105 S.Ct. at 3258.
 
 
 34
 The Supreme Court has held that municipal residency requirements for maintaining employment are not irrational. McCarthy v. Philadelphia Civil Serv. Comm'n, 424 U.S. 645, 647, 96 S.Ct. 1154, 1155, 47 L.Ed.2d 366 (1976); see also Detroit Police Officers Ass'n v. City of Detroit, 405 U.S. 950, 92 S.Ct. 1173, 31 L.Ed.2d 227 (1972) (dismissing appeal for failure to present a substantial federal question by challenging a Detroit residency requirement for police officers), dismissing appeal from 385 Mich. 519, 190 N.W.2d 97 (1971) (en banc). The Supreme Court of New Jersey has also held that municipal residency requirements do not violate equal protection guarantees. Kennedy v. City of Newark, 29 N.J. 178, 148 A.2d 473 (1959) (rejecting a state constitutional challenge); Trainor v. City of Newark, 145 N.J.Super. 466, 368 A.2d 381 (App.Div.1976).
 
 
 35
 Despite the foregoing principles, plaintiffs have raised several equal protection challenges which we will address in turn.
 
 1. State Law Exceptions
 
 36
 The City's residency ordinance states that all officers and employees of the City are to be residents but the New Jersey Legislature has enacted several statutes that exempt certain employees from municipal residency requirements.[8] These exemptions appear to leave the residency requirement applicable only to blue-collar and clerical employees of the City.
 
 
 37
 Although the governing state statutes exempt many employees from the ordinance, their validity is not before this court. Thus, we focus, as the district court did, solely on whether there is a "rational basis" for the City's residency requirement. The controlling issue is whether a legitimate governmental purpose is served by the classification of the ordinance, keeping in mind that we will only set aside the ordinance's classifications "if no grounds can be conceived to justify them." McDonald v. Board of Election Comm'rs, 394 U.S. 802, 809, 89 S.Ct. 1404, 1408, 22 L.Ed.2d 739 (1969). An examination of the purposes set forth in the preamble to the ordinance under attack reveal grounds to support the ordinance, e.g., "provide unto the City economic benefits". We conclude that it serves a legitimate governmental purpose.
 
 2. Grandfather Clause Exception
 
 38
 Section 3(d) of the Municipal Residency Ordinance exempts from the residency requirement "[a]ny person employed by the City who resides outside the City as of the date of the adoption of this ordinance." JA 39. Appellants claim that this is an irrational application of the residency requirement.[9]
 
 
 39
 The Supreme Court has approved of "grandfather" clauses that protect individuals and interests from changes in the law that would destroy established reliance on previously valid regulations and laws. See City of New Orleans v. Dukes, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) (upholding in the face of an equal protection challenge a grandfather clause that exempted certain street vendors from new regulations in the French Quarter). Further, we note that at least two courts of appeals have upheld the validity of such clauses under a rational basis analysis. Lorenz v. Logue, 611 F.2d 421, 423 (2d Cir.1979) (per curiam) ("By not applying [the residency requirement] to pre-1978 employees who never received any warning of a residency requirement when they took their jobs, the City protected these employees' legitimate expectations." (emphasis in original)); Simien v. City of San Antonio, 809 F.2d 255, 257 (5th Cir.1987) ("The grandfathering of other employees based on the length of their employment is a constitutional means to gradually achieve a workforce that resides in the city."). We also conclude that the exemption of those employees who were employed prior to the adoption of the ordinance and who lived outside the City does not render the ordinance unconstitutional.[10] We find no irrationality in this grandfather clause.
 
 
 40
 C. Fourteenth Amendment Due Process Challenges
 
 
 41
 Plaintiffs raised five claims of due process violations under the Equal Protection Clause in the district court. The district court held that each was without merit and granted summary judgment to the City. Appellants' brief presents only two of the original five claims for our review.
 
 1. Selective Enforcement
 
 42
 Plaintiffs claim that although the ordinance had been in effect for more than fourteen years at the time of Scull's notice of violation, there was an absence of evidence that it was invoked, which they argue shows that it was being selectively enforced against Scull. The City, however, provided evidence of enforcement of the ordinance against an employee who chose to reside outside of the City. JA 188-91. Because the City was able to negate the appellants' claim that the ordinance was never enforced, the district court properly granted summary judgment. The appellants have not met their burden, which requires them to offer evidence "that the [municipality] intentionally and purposefully discriminated against [Scull] by failing to prosecute other similarly situated persons." United States v. Torquato, 602 F.2d 564, 570 (3d Cir.), cert. denied, 444 U.S. 941, 100 S.Ct. 295, 62 L.Ed.2d 307 (1979). Thus the City was entitled to summary judgment.
 
 2. Notice of the Requirement
 
 43
 Plaintiffs next contend that Scull had not been given written or oral notice of the residential requirement when he was appointed to his position. The record, however, contains evidence that copies of the ordinance were posted in work areas so as to give notice to employees. JA 186.[11] We note further that Scull was given ample time and opportunity to avoid termination once he had been given notice of his violation.[12] Our review of the record reveals that Scull has failed to raise an issue of material fact that would require a reversal of the district court's grant of summary judgment.
 
 IV.
 
 44
 We will affirm the district court's order granting the defendants' summary judgment and denying plaintiffs' motion for summary judgment.
 
 
 45
 SLOVITER, Chief Judge, dissenting.
 
 
 46
 It is ironic that notwithstanding the intent of the Privileges and Immunities Clause to "fuse into one Nation a collection of independent, sovereign States," Toomer v. Witsell, 334 U.S. 385, 395, 68 S.Ct. 1156, 1162, 92 L.Ed. 1460 (1948), the motivation to retain privileges for one's own citizens has remained strong. Thus, the history of the Privileges and Immunities Clause, albeit somewhat sparse, consists of a series of cases in which obstacles erected by parochialism but sought to be justified in the name of valid local interests generally have been found wanting when measured against the goal of national unity.
 
 
 47
 The issue before us is apparently one of first impression for an appellate court: whether the Clause applies to statutes burdening purely public employment. Because I conclude, contrary to my colleagues, that it does apply, I respectfully dissent.
 
 I.
 
 48
 The majority bases its holding that the Privileges and Immunities Clause is inapplicable in this case on its conclusion that "direct public employment is not a privilege or fundamental right protected by the Privileges and Immunities Clause of Article Four." Maj. Op. at 270. It recognizes that the Supreme Court cases have dealt only with private employment in this context. The majority infers, however, based on language it quotes from the Court's opinion in United Building & Construction Trades Council v. Mayor & Council of Camden, 465 U.S. 208, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1984) (hereinafter Camden), that the Supreme Court was establishing an unwavering distinction between private and public employment. However, Camden, rather than providing the basis for a restrictive ruling, is a case that significantly expanded the scope of the Privileges and Immunities Clause by applying it to restrictions placed on employment of nonresidents by private employers on publicly-funded work projects. Therefore, I believe that the majority's conclusion does not follow from Camden.
 
 
 49
 There can be no question that among the privileges encompassed in the Privileges and Immunities Clause is that of employment. The centrality of commerce among the protections provided by that Clause is well-established, notwithstanding the focus of the Court in an early discussion on other attributes of citizenship. In Paul v. Virginia, the Court stated the purpose of the Clause is:
 
 
 50
 to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned. It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; it gives them the right of free ingress into other States, and egress from them; it insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; and it secures to them in other States the equal protection of their laws. It has been justly said that no provision in the Constitution has tended so strongly to constitute the citizens of the United States one people as this.
 
 
 51
 75 U.S. (8 Wall.) 168, 180, 19 L.Ed. 357 (1869).
 
 
 52
 Thus, although equality of commercial opportunities among citizens of different states was primarily seen as the function of the Commerce Clause, there were early cases that relied on the Privileges and Immunities Clause to strike state statutes that discriminated against efforts of nonresidents to ply their trade. See, e.g., Blake v. McClung, 172 U.S. 239, 19 S.Ct. 165, 43 L.Ed. 432 (1898) (invalidating state law which granted preference to resident creditors of insolvent foreign corporations); Ward v. Maryland, 79 U.S. (12 Wall.) 418, 20 L.Ed. 449 (1871) (striking Maryland statute which established discriminatory licensing fee scheme based on residency for the sale of out-of-state goods).
 
 
 53
 Justice Brennan has dated the analytical framework used in the modern cases applying the Clause to Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948), holding violative a South Carolina statute requiring nonresidents to pay a shrimp harvesting licensing fee one hundred times greater than that charged residents. See also Mullaney v. Anderson, 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952) (invalidating commercial fishing licensing fee which was ten times greater for nonresidents than for residents of Alaska).
 
 
 54
 Although the majority rationalizes its holding on the survival of a public/private distinction, in fact the Supreme Court has consistently rejected public ownership of assets as a sufficient justification in itself for discriminatory rules. In Hicklin v. Orbeck, 437 U.S. 518, 98 S.Ct. 2482, 57 L.Ed.2d 397 (1978), Alaska sought to justify its preference for employing Alaska residents in projects developing Alaskan oil or gas on the ground that "the oil and gas that are the subject of Alaska Hire are owned by the State." Id. at 528, 98 S.Ct. at 2489. The Supreme Court rejected that contention, stating, "[w]e do not agree that the fact that a State owns a resource, of itself, completely removes a law concerning that resource from the prohibitions of the Clause." Id.
 
 
 55
 Even in the one recent Supreme Court case to uphold a state preference, i.e., Montana's rule charging its residents a lower fee than charged to nonresidents for a license to hunt elk for sport, the Court noted that despite the early cases giving states the right to preserve their wildlife bounty for their citizens alone, "[i]n more recent years ... the Court has recognized that the States' interest in regulating and controlling those things they claim to 'own,' ... is by no means absolute." Baldwin v. Fish & Game Comm'n of Montana, 436 U.S. 371, 385, 98 S.Ct. 1852, 1861, 56 L.Ed.2d 354 (1978). The Court cautioned that "a State's interest in its wildlife and other resources must yield when, without reason, it interferes with a nonresident's right to pursue a livelihood in a State other than his own, a right that is protected by the Privileges and Immunities Clause." Id. at 386, 98 S.Ct. at 1861. Thus, the rationale that the Court used in sustaining Montana's licensing scheme was that elk hunting was not a "basic and essential activit[y], interference with which would frustrate the purposes of the formation of the Union," id. at 387, 98 S.Ct. at 1862, rather than one based on public ownership of the wilderness and its bounty.
 
 
 56
 It was in this stage of the analytic development of the Clause that the Court decided Camden, a decision noteworthy on several grounds. Before that decision, the Court had not applied the Privileges and Immunities Clause to municipal ordinances. In Camden, the Court ruled that because "a municipality is merely a political subdivision of the State from which its authority derives ... what would be unconstitutional if done directly by the State can no more readily be accomplished by a city deriving its authority from the State." 465 U.S. at 215, 104 S.Ct. at 1026. Moreover, it rejected the New Jersey Supreme Court's conclusion "that the Privileges and Immunities Clause does not apply to an ordinance that discriminates solely on the basis of municipal residency." Id. The Court applied a common sense approach, recognizing that "[a] person who is not residing in a given State is ipso facto not residing in a city within that State." Id. at 216-17, 104 S.Ct. at 1027. Therefore, "an out-of-state citizen who ventures into New Jersey will not enjoy the same privileges as the New Jersey citizen residing in Camden." Id. at 217, 104 S.Ct. at 1027. Thus, the Camden ordinance was subject to constitutional review under the Clause at the behest of out-of-state residents.
 
 
 57
 The other landmark ruling to emerge from the Camden opinion was, of course, the holding that the City of Camden's hiring preference ordinance, requiring that at least forty percent of the employees of contractors and subcontractors working on city construction projects be Camden residents, was subject to the strictures of the Privileges and Immunities Clause. The ruling was particularly noteworthy because the preceding year the Court sustained an analogous executive order of the mayor of Boston against a challenge under the Commerce Clause. See White v. Massachusetts Council of Constr. Employers, Inc., 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983). The Court explained, however, that "the fact that Camden is merely setting conditions on its expenditures for goods and services in the marketplace [which defeated the Commerce Clause challenge in White] does not preclude the possibility that those conditions violate the Privileges and Immunities Clause." Camden, 465 U.S. at 220, 104 S.Ct. at 1028-29.
 
 
 58
 Accordingly, the Court turned to the "threshold matter" of "whether an out-of-state resident's interest in employment on public works contracts in another State is sufficiently 'fundamental' to the promotion of interstate harmony so as to 'fall within the purview of the Privileges and Immunities Clause.' " Id. at 218, 104 S.Ct. at 1027-28 (citation omitted). The majority and I differ in our interpretation of the Court's analysis in response to this query.
 
 
 59
 The Court first stated that "[c]ertainly, the pursuit of a common calling is one of the most fundamental of those privileges protected by the Clause." Id. at 219, 104 S.Ct. at 1028. It continued, in the sentence the majority finds dispositive, "[p]ublic employment, however, is qualitatively different from employment in the private sector; it is a subspecies of the broader opportunity to pursue a common calling." Id. The Court then noted that it had held there is no fundamental right to government employment for purposes of the Equal Protection Clause, citing Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 313, 96 S.Ct. 2562, 2566, 49 L.Ed.2d 520 (1976) (per curiam), and referred to its decision in White holding that the Commerce Clause did not preclude such municipal favoritism of residents in employment.
 
 
 60
 Notwithstanding all of the above, the Court proceeded to hold that the Privileges and Immunities Clause was applicable. The Court distinguished the Commerce Clause analysis from that applicable to the Privileges and Immunities Clause, stating that "[i]t is discrimination against out-of-state residents on matters of fundamental concern which triggers the Clause, not regulation affecting interstate commerce." Id. 465 U.S. at 220, 104 S.Ct. at 1028. I read the Court's opinion in Camden as holding that notwithstanding the inapplicability of other clauses of the Constitution to a municipal residency requirement, such a requirement trenches on the raison-d'etre of the Privileges and Immunities Clause.
 
 
 61
 Consistent with its decision in Hicklin, the Camden Court rejected the argument that the public ownership of the assets used for the municipal projects immunized the residency requirement from Privileges and Immunities scrutiny, noting that in its earlier cases it had concluded "that the State's interest in controlling those things it claims to own is not absolute." Id. at 221, 104 S.Ct. at 1029. It continued,
 
 
 62
 Much the same analysis, we think, is appropriate to a city's efforts to bias private employment decisions in favor of its residents on construction projects funded with public moneys. The fact that Camden is expending its own funds or funds it administers in accordance with the terms of a grant is certainly a factor--perhaps the crucial factor--to be considered in evaluating whether the statute's discrimination violates the Privileges and Immunities Clause. But it does not remove the Camden ordinance completely from the purview of the Clause.
 
 
 63
 Id. (emphasis added).
 
 
 64
 The Camden opinion suggests, even if it does not actually hold, that even a direct municipal residency requirement or preference for municipal employment will be subject to scrutiny under the Privileges and Immunities Clause. Although the Court did indeed comment that "[t]he opportunity to seek employment with [private contractors and subcontractors engaged in public works] is 'sufficiently basic to the livelihood of the Nation' ... as to fall within the purview of the Privileges and Immunities Clause even though the contractors and subcontractors are themselves engaged in projects funded in whole or part by the city," id. at 221-22, 104 S.Ct. at 1029 (citation omitted), this does not signify that when faced with a direct employment issue, the Court would accept the distinction made by the majority.
 
 
 65
 The expansive reading the Court gave to the Clause suggests to the contrary, particularly in light of the undisputed fact that in recent times, as public employment continues to expand, nearly one-sixth of all jobs in New Jersey, as well as one-fifth of those throughout the country, are held by public employees. App. at 138-44 (citing data from Bureau of Labor Statistics, U.S. Dept. of Labor, Employment, Hours, and Earnings, States and Areas, Data for 1987-1992 384 (1992) (documenting that of a total of 3,493,100 nonfarm employees in New Jersey, 566,700 or 16.2% were government employees and that nationally, of a total of 89,930,000 nonfarm employees, 18,379,000 or 20.4% were government employees)). In terms of its economic importance, it can hardly be doubted that government employment surpasses shrimp fishing, Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948), commercial fishing, Mullaney v. Anderson, 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458 (1952), trade of foreign goods, Ward v. Maryland, 79 U.S. (12 Wall.) 418, 20 L.Ed. 449 (1871), and the practice of law, Supreme Court of Virginia v. Friedman, 487 U.S. 59, 108 S.Ct. 2260, 101 L.Ed.2d 56 (1988); Supreme Court of New Hampshire v. Piper, 470 U.S. 274, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985), all trades sufficiently fundamental to warrant the Clause's protection.
 
 
 66
 I do not suggest that a residence requirement for municipal employees necessarily violates the Privileges and Immunities Clause. This is, as the Court noted in Camden, only the first step. Once it is determined that the Privileges and Immunities Clause is applicable, the court must then apply the Toomer analysis, under which it must be determined whether there is a "substantial reason" for the difference in treatment and "whether the degree of discrimination bears a close relation" to those reasons. See Toomer, 334 U.S. at 396, 68 S.Ct. at 1162. The majority's analysis pretermits that inquiry. The result is that a substantial number of jobs will be permanently foreclosed from out-of-state residents for what may be insubstantial reasons. This is a result that I believe is incompatible with the Privileges and Immunities Clause.
 
 II.
 
 67
 The appellants do not challenge the legal principle enunciated by the majority that municipal residency requirements for public employment do not on their face violate the Equal Protection Clause. Their objection is a different one, in that they pose a challenge to the ordinance as it has been applied. Essentially their claim is that the cumulative effect of the various exemptions from the residency requirement, both statutory and in practice, makes any distinction between residents and nonresidents arbitrary or irrational.
 
 
 68
 Thus, the appellants argue that "a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational" cannot be deemed rational. Appellants' Brief at 37 (citing City of Cleburne v. Cleburne Living Center, Inc., 473 U.S. 432, 446, 105 S.Ct. 3249, 3258, 87 L.Ed.2d 313 (1985)). I do not understand the majority to challenge the contention that in the main it is the clerical and blue collar workers of the city who are required to be Salem residents, while employees who are better connected politically, such as police, supervisors, and other white collar workers, work for the city but reside outside of its borders. The majority explains that each of the exemptions has a justifiable explanation, such as an exemption pursuant to state statute or a legitimate grandfather clause. The majority's analysis, however, fails to take into consideration the cumulative effect of the exemptions. Even if each exemption is itself explicable, together they produce a patchwork of exemptions that throw into question the rationality of the scheme.
 
 
 69
 I am, above all, troubled by the allegation that the residency requirement lay dormant until applied against appellant Scull when he questioned the conduct of a volunteer firefighter at the scene of a fire. See App. at 173. I find the majority's response, that the residency requirement was also enforced against another employee, unpersuasive. Nonetheless, because I believe that this is an appropriate case for decision of the still undecided question of the applicability of the Privileges and Immunities Clause to public employment, I rest on that ground alone for my position that the order of the district court should be reversed.
 
 
 70
 PRESENT: SLOVITER, Chief Judge, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD, ALITO, ROTH, LEWIS, McKEE, and SEITZ*, Circuit Judges.
 
 SUR PETITION FOR REHEARING
 Sept. 28, 1994
 
 71
 The petition for rehearing filed by appellants in the above captioned matter having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.
 
 
 72
 Judge Mansmann would grant rehearing.
 
 
 
 [1]
 The district court reasoned that because the City did not challenge the allegation in its answer to plaintiffs' complaint, it is to be taken as true and thus the Association has standing. The City in its answer stated that it did not possess the knowledge or information to dispute the plaintiffs' allegation regarding the Association's claim to having out-of-state members. The City's answer to that allegation constitutes a denial under the Federal Rules of Civil Procedure. See F.R.C.P. 8(b) ("If a party is without knowledge or information sufficient to form a belief as to the truth of an averment, the party shall so state and this has the effect of a denial."). However, plaintiffs did submit an affidavit from Mr. Paul Ledford, President of the Association, in which Mr. Ledford certified that the Association includes out-of-state members. JA 162-63 p 3. As this matter was before the district court on summary judgment, the City could not rest on what amounted to a pleading denial to create an issue of material fact on the standing issue. Thus, the Association was entitled to prevail
 
 
 [2]
 The Court in Piper rejected arguments that lawyers are not protected by the Clause holding, inter alia, that the " 'activities of lawyers play an important part in commercial intercourse.' " Piper, 470 U.S. at 281, 105 S.Ct. at 1277 (quoting Goldfarb v. Virginia State Bar, 421 U.S. 773, 788, 95 S.Ct. 2004, 2014, 44 L.Ed.2d 572 (1975)). The Piper Court quoted Justice Bushrod Washington's opinion in Corfield v. Coryell, 6 F.Cas. 546 (No. 3,230) (CCED Pa.1825), in an attempt to define what "fundamental rights" are protected by the Clause:
 "The right of a citizen of one state to pass through, or to reside in any other state, for purposes of trade, agriculture, professional pursuits, or otherwise; to claim the benefit of the writ of habeas corpus; to institute and maintain actions of any kind in the courts of the state; to take, hold and dispose of property, either real or personal...."
 Piper, 470 U.S. at 281 n. 10, 105 S.Ct. at 1277 n. 10 (quoting Corfield, 6 F.Cas. at 552).
 
 
 [3]
 The Court noted that the origin of both clauses is found in the Fourth Article of the Articles of Confederation. In relevant part, that Article states:
 The better to secure and perpetuate mutual friendship and intercourse among the people of the different states in this union, the free inhabitants of each of these states ... shall be entitled to all privileges and immunities of free citizens in the several states; and the people of each State shall have free ingress and regress to and from any other State, and shall enjoy therein all the privileges of trade and commerce....
 Hicklin, 437 U.S. at 532 n. 16, 98 S.Ct. at 2491 n. 16.
 
 
 [4]
 The Court declined to address the merits of the privileges and immunities challenge in White because the lower court did not reach the issue. Camden, 465 U.S. at 214, n. 7, 104 S.Ct. at 1025 n. 7
 
 
 [5]
 As the district court correctly noted, the Court's holding in Camden that there was private employment is "consistent with the Court's view that the Commerce Clause focuses on the perspective of the state or local government while the Privileges and Immunities Clause focuses on the perspective of the individual." 832 F.Supp. at 860 n. 4; see generally Bogen, The Privileges and Immunities Clause, supra
 
 
 [6]
 We note that the Supreme Court has stated that "the privileges and immunities clause is not an absolute." Toomer, 334 U.S. at 396, 68 S.Ct. at 1162. Further, the Court has pointed out that the "States should have considerable leeway in analyzing local evils and in prescribing appropriate cures," id., but the court must determine whether non-residents are the source of the evils that do exist and whether the actions taken by the states are reasonably related to curing them, id.; see Mullaney v. Anderson, 342 U.S. 415, 418, 72 S.Ct. 428, 430, 96 L.Ed. 458 (1952). As was the case in Camden, there was no trial, thus there were no findings of fact. If we had held public employment to be within the scope of the Clause, remand would have been necessary to permit the district court to make findings on this issue. See Camden, 465 U.S. at 223, 104 S.Ct. at 1030
 
 
 [7]
 Although Scull does not have standing to challenge the ordinance as violative of the Privileges and Immunities Clause, he does have standing to assert an equal protection challenge
 
 
 [8]
 In particular, N.J.S.A. 40A:14-9.1 exempts firefighters, N.J.S.A. 40A:14-122.1 exempts police officers, and N.J.S.A. 18A:26-1.1 exempts teachers from the residency requirements. Lastly, some officer posts and appointed positions may be held by nonresidents. N.J.S.A. 40A:9-1.1 (nonresident may be appointed director of public safety); N.J.S.A. 40A:9-11 (nonresident may be counsel, attorney, engineer, health officer, auditor or comptroller of the municipality). See also, Municipal Residency Ordinance # 78-3 (exempting certain positions requiring specialized education and talent and those individuals "grandfathered" in under the ordinance) (JA 38-39)
 The City contended in its brief, and at oral argument, that these exemptions should not be considered applicable to the City of Salem. As a "technical" matter, the City does not have any paid firefighters so the state exemption does not apply. Further, the City does not employ any teachers or librarians in the context required for those exemptions to apply. Lastly, the City avers that although there is an exemption for the Public Safety Director, the City does not have such a position.
 
 
 [9]
 Appellants offer as an example Mr. Kenneth Homan, Scull's former supervisor. Mr. Homan was "grandfathered" in because he began working for the City prior to the enactment of the City ordinance. Appellants suggest that Mr. Homan should have been living in the City as required by the state law at that time that required all "officers" reside within their respective municipalities. See N.J.S.A. 40A:9-1 (repealed June 30, 1978). It is interesting to note, however, that even if Mr. Homan was not "grandfathered" in under the new ordinance, he would have been exempt from the ordinance by virtue of N.J.S.A. 40A:9-11, which exempts "health officers." As Mr. Homan was Superintendent of the municipal water supply and waste water treatment facility and required to be licensed as a health officer pursuant to N.J.S.A. 26:1A-41, he would be exempt. See generally N.J.S.A. 26:1A-7 (granting the State Department of Health jurisdiction over matters relating to sewage and waste water)
 
 
 [10]
 The ordinance's grandfather exemption is not absolute, however. Section 3(d) states that if the grandfathered employee "subsequently makes his residence within the City [he] shall not be exempt from the requirements of this ordinance."
 
 
 [11]
 Despite our hesitation to point to such hearsay evidence, we recognize that the summary judgment record contains an unchallenged affidavit of Mr. Thomas G. Smith, Sr., Salem's Municipal Administrator, that states that Scull contacted the president of the Association prior to moving out of the City to inquire into the requirements of the ordinance. JA 183. Mr. Smith's affidavit avers that the president disclosed that Scull contacted him and that the inquiry was revealed during grievance proceedings that took place prior to this suit. Id
 
 
 [12]
 Scull was given an initial period of ten days to correct his situation by his employer but this period was later extended to six months. Ultimately, the time requirement was stayed pending the outcome of these proceedings
 
 
 *
 Hon. Collins J. Seitz, United States Circuit Judge, was limited to voting for panel rehearing